JAMES C. PETERS ET AL., APPELLANTS, v. WOODMAN ACCIDENT AND LIFE COMPANY, A CORPORATION, ET AL., APPELLEES.
104 N. W. 2d 490

Filed July 22, 1960. No. 34768.

862

*Towle, Young & McManus, Max Kier,* and *Janice L. Gradwohl,* for appellants.

*Bert L. Overcash, Woods, Aitken & Aitken,* and *Peterson & Ackerman,* for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, James C. Peters, Ruth Tucker Newberg, Helen A. Adamson, and Arthur H. Newberg, brought this action as minority stockholders in Woodmen Central Life Insurance Company, for themselves and said company and all other stockholders thereof similarly situated, against defendants, Woodmen Accident and Life Company, a mutual insurance corporation, Woodmen Central Life Insurance Company, a stock corporation, and its named officers and directors. Plaintiffs sought thereby to obtain recovery of the value of an alleged agency force of Woodmen Central Life Insurance Company for which no consideration was included or paid under a reinsurance agreement whereby Woodmen Accident and Life Company, generally called Woodmen Accident, purchased the assets and reinsured the life and annuity contracts of Woodmen Central Life Insurance Company, generally called Woodmen Central. Plaintiffs alleged that officers of Woodmen Central were also officers of Woodmen Accident except Victor L. Toft and Ervin F. Rucklos, who were made directors of Woodmen Accident after the dissolution of Woodmen Central; that officers and directors of Woodmen Central and Woodmen Accident entered into a fraudulent plan,

scheme, and conspiracy to cheat and defraud plaintiffs and other stockholders, and pursuant thereto and by false representations believed by and relied upon by plaintiffs, defendants obtained the reinsurance agreement and thereby wrongfully appropriated the value of the agency force of Woodmen Central, causing its stockholders to be defrauded thereof, for the use and benefit of Woodmen Accident and other defendants.

Plaintiffs' prayer was for an accounting and for judgment in favor of plaintiffs on behalf of stockholders of Woodmen Central and said company for the alleged reasonable value of its agency force. In that connection, all defendants were served except defendant Joseph A. Spangler, and he is not primarily involved here.

Defendant Woodmen Central answered separately, denying that plaintiffs' action was for the use and benefit of it or any of its stockholders; admitting the sale of its assets and the reinsurance of its insurance in force; alleging that said reinsurance agreement was entered into freely and voluntarily by the parties thereto and for a full and adequate consideration; and alleging that said agreement was duly adopted and approved by its stockholders at a meeting thereof held on December 20, 1954, at which 17,784 shares out of a total of 19,491 shares outstanding, were represented in person or by proxy who unanimously approved said agreement. Said defendant also alleged that the agreement was a valid and binding obligation of the parties thereto, and that defendants never received from plaintiffs or from any other stockholders any demand to bring this action or any similar action prior to the filing of this action. Woodmen Central's prayer was for dismissal of plaintiffs' petition at plaintiffs' costs.

The answer of other defendants admitted execution of the reinsurance agreement and denied all plaintiffs' allegations of fraud and conspiracy. They alleged that plaintiffs and all other stockholders were completely and fully advised of the transaction before its consum-

mation; that there was no concealment or misrepresentation of any fact or information relating thereto; that complete records of Woodmen Central were open and available to plaintiffs at all times; that plaintiffs had a right and full opportunity to attend the business meeting of said company and cast their votes in person or by proxy concerning said transaction and otherwise protect their rights, if any; and that the price, terms, and conditions set forth in the reinsurance agreement represented the true, just, and fair value of all the assets involved, and reflected the sound business judgment of the respective parties based upon extensive study, consultation, and experience. Defendants also alleged that said agreement was unanimously approved by the directors of each company and was unanimously approved by the stockholders and policyholders present and represented by proxy at a meeting called for consideration of the agreement; that Woodmen Central, prior to 1936, was known as Cornbelt Life Insurance Company, which was in unsound financial condition and never became in such financial condition as would justify or permit distribution of earnings or surplus in the form of dividends to the stockholders. Defendants denied that Woodmen Accident appropriated an agency force of Woodmen Central, but alleged that it never had any separate agency force which was available and subject to appropriation by Woodmen Accident. Defendants specifically alleged that officers and directors of Woodmen Accident during 1954 and at the time of the reinsurance agreement transaction consisted of defendants Edwin J. Faulkner, Richard L. Spangler, and Walter S. Henrion, together with H. J. Requartte, Thomas C. Woods, Walter W. White, George P. Abel, Burnham Yates, and Thomas H. Wake; that with the exception of Edwin J. Faulkner, Richard L. Spangler, and Walter S. Henrion, none of said Woodmen Accident directors were officers, stockholders, directors, or otherwise interested in Woodmen Central; and that the negotiations and final

recommendations on behalf of Woodmen Accident with reference to said reinsurance agreement were carried on and concluded by a committee of said directors for Woodmen Accident, having no affiliation with or interest in Woodmen Central. Defendants also alleged that joint application for approval of the transaction was filed with the Department of Insurance on November 3, 1954; that said application was investigated by said department and staff and ordered approved on November 12, 1954, subject to approval at a meeting of stockholders and policyholders of the respective companies, which was done; and that no appeal was ever taken by anyone from the decision and order of said department.

Defendants further alleged that plaintiff Peters attended the annual meetings of Woodmen Central in 1955 and 1956, at which time minutes of special meetings of the company approving the reinsurance agreement and authorizing distribution of the assets in liquidation of the company were read and approved by him and other stockholders; and said plaintiffs are estopped from maintaining the action and plaintiffs' action is barred by laches. Defendants' prayer was for dismissal and recovery of costs.

Plaintiffs' replies were general denials. Interrogatories were submitted and answered. Plaintiffs then filed separate requests for admissions by defendants, some of which were objected to for reasons unimportant here, and some of which were denied or admitted in whole or in part, or qualified in material respects. Thereafter trial was had to the court whereat voluminous evidence was adduced by the parties and a judgment was rendered which found and adjudged the issues generally in favor of defendants and against plaintiffs, and dismissed plaintiffs' petition at plaintiffs' costs. The court therein specifically found and adjudged, as far as important here, that no fraud, deception, concealment, misrepresentation of fact, overreaching, plan, scheme, or conspiracy to cheat or defraud the stockholders of

Woodmen Central or the company existed or was practiced in connection with consummation of the reinsurance agreement; that prior to consummation thereof, plaintiffs, as well as all other stockholders of Woodmen Central, were given full and adequate information and notice concerning the proposed reinsurance agreement, including notice that no separate and additional amount was included in the consideration proposed in said agreement for an agency force of Woodmen Central; that at the time Cornbelt Life Insurance Company changed its name to Woodmen Central in 1936, it had ceased to write life insurance and had no agency force; that Woodmen Central never at any time thereafter had any agency force separate and apart from the agency force of Woodmen Accident; that after change of corporate name from Cornbelt Life Insurance Company to Woodmen Central in 1936, it used the agency force of Woodmen Accident in those states in which Woodmen Central was admitted to do business; that Woodmen Accident, at the time of the reinsurance agreement, had changed its corporate name to Woodmen Accident and Life Company; and that at time of consummation of the reinsurance agreement, Woodmen Accident already possessed the agency force being used by Woodmen Central, and there was no agency force deliverable by it to Woodmen Accident. The judgment also found that plaintiffs' ownership of stock in Woodmen Central represented only 30 shares of stock out of 19,491 shares outstanding; that individual defendants and associates owned 13,422 shares of the 17,784 shares voted in favor of the reinsurance agreement, said voted shares being all of the shares represented at the stockholders' meeting called to vote on said agreement; that plaintiffs' interest is so minimal that it could be reasonably assumed that the other stockholders were satisfied with fairness of the transaction; that plaintiff Peters was the only plaintiff who appeared at the trial and testified; that he owns 10 shares of stock in Woodmen Central and as a stockholder par-

ticipated in the subsequent 1955 and 1956 annual meetings of the stockholders at which minutes of the special meeting of the stockholders authorizing the reinsurance agreement were reviewed and unanimously approved without objection; and that Peters brought no action challenging the transaction until 22 months after the reinsurance agreement was approved by the Department of Insurance. The judgment further found that individual defendants would materially and substantially benefit financially only if the position of plaintiffs was correct and upheld, and a separate agency force value were added to the amount paid Woodmen Central.

Thereafter, plaintiffs' motion for new trial was overruled, and they appealed, assigning some 23 alleged errors, the substance and effect of which was to claim that the findings and judgment of the trial court were contrary to the evidence and law. We do not sustain the assignments.

We have examined the record in the light of rules hereinafter set forth. As reaffirmed in Pike v. Triska, 165 Neb. 104, 84 N. W. 2d 311: "Actions in equity, on appeal to this court, are triable de novo, subject, however, to the rule that when credible evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite."

This court has held that an officer or director of a corporation occupies a fiduciary relation to the corporation and to stockholders. He is treated by courts of equity as a trustee, and as such is ordinarily personally liable to beneficiaries of a fund for any misapplication of the fund to other beneficiaries not entitled thereto. Whaley v. Matthews, 134 Neb. 875, 280 N. W. 159.

In Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393, we held: "Within the limits of their authority

officers and directors possess full discretionary power and in the honest and reasonable exercise of such power they are not subject to control by the stockholders or by the courts, at the instance of a stockholder. In the absence of usurpation, fraud, or gross negligence, courts of equity will not interfere at the suit of dissatisfied stockholders, merely to overrule and control the discretion of directors on questions of corporate management, policy, or business.

"A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.

"The principal element of conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another. It involves some mutual mental action coupled with an intent to commit the act which results in injury.

"Fraud is never presumed, but must be clearly proved in order to entitle a party to relief on the ground that it has been practiced on him.

"Fraud cannot be presumed or inferred without proof in a court of equity any more than in a court of law. However, courts of equity do not restrict themselves by the same rigid rules as courts of law in the investigation of fraud and in the evidence and proofs required to establish it. However, the proof must be sufficient to satisfy the conscience of the court that fraud is really existent, and to do this, it must be sufficient to overcome the natural presumption, which is always of considerable force, that men are honest and act from correct motives.

"To prove fraud direct evidence is not always essential. Inferences or presumptions of fraud may be drawn from facts and circumstances. But such inferences or presumptions must not be guess work or conjecture but must be rational and logical deductions from the facts and circumstances from which they are inferred.

"Value of property is always a matter of judgment, and a contract based upon inadequate consideration will not be set aside for that reason alone, unless, as the rule is generally stated, the inadequacy is so great as to furnish of itself convincing evidence of fraud.

"Fraud is never presumed and the party alleging and relying thereon must prove it. However, what constitutes fraud is a matter of fact in each case. Deception finds expression in such a variety of ways that courts have studiously avoided reducing its elements to positive definitions. Courts content themselves with determining from the facts in each case whether fraud does or does not exist, for whatever satisfies the mind and conscience that fraud has or has not been practiced is sufficient."

Such opinion also held: "Transactions between corporations having common officers and directors are presumptively fraudulent and the burden is upon the defendants to sustain the transactions by clear and convincing evidence that they were fair."

We may assume for purpose of argument only that the corporations here involved had common officers and directors. However, such holding aforesaid means that the burden is upon defendants to go forward with the evidence after plaintiff has made a prima facie case and sustain that the transaction was fair, by clear and convincing evidence. In that connection, we held in Pike v. Triska, *supra:* "In an action in which relief is sought on account of alleged fraud, the existence of a confidential or fiduciary relationship, or status of unequal footing, when shown, does not shift the position of the burden of proving all elements of the fraud alleged, but nevertheless may be sufficient to allow fraud to be found to have existed when in the absence of such a status it could not be so found, and thus to have the effect of placing the burden of going forward with the evidence upon the party charged with fraud."

In Price v. Fraser, 119 Neb. 806, 231 N. W. 18, this

court said: "While the court will closely examine for possibility of fraud transactions where the directors of a corporation which purchases property are also directors in the corporation which sells the same, such sale, however, is not unlawful and not void, but voidable only, and will be set aside only after a finding that the financial interest of such directors are such that they could not have honestly performed their duties as directors of the selling corporation. Such a sale will not, then, be set aside if made in good faith and for an adequate consideration. City Trust Co. v. Bankers Mortgage Loan Co., 102 Neb. 532; 14 C. J. 125; 7 R. C. L. 461, sec. 444."

The trial court in the case at bar found that: "* * * the individual defendants herein would materially and substantially benefit financially, if the position of the plaintiffs was correct and upheld * * *." In that connection, the trial court was correct, because the record discloses without factual dispute that if $167,259 for the value of Woodmen Central's alleged agency force was recovered by plaintiffs for themselves and said company, then the seven individual defendants herein would benefit generally in varying amounts, totalling $56,256.01, and other stockholders, members of their families, and business associates would benefit generally in the total amount of $58,918.18, making a total benefit of $115,174.19. In that situation, it would be entirely illogical to say that the financial interests of such defendants was such that they could not have honestly performed their duties as officers and directors in making and approving the reinsurance agreement, which deprived them of such benefits.

Woodmen Accident, now known as Woodmen Accident and Life Company, was a mutual insurance company organized in 1890. From 1915 to 1954 its corporate name was Woodmen Accident Company. It originally engaged in the sale of accident insurance, but sickness and life insurance has also been sold by it since 1954 when its corporate name was changed to Woodmen

Accident and Life Company, and as such it is a defendant herein.

Woodmen Central Assurance Company, a mutual insurance company hereinafter called Woodmen Assurance, was organized in 1916 under the name of Central Health Company. It originally engaged in the sale of sickness insurance and sold life insurance since 1944. Its corporate name was amended to be Woodmen Central Assurance Company some years prior to its merger with Woodmen Accident and Life Company, effective December 31, 1954.

Cornbelt Life Insurance Company, a stock insurance company, was organized prior to 1932 and engaged in the sale of life insurance wholly within the State of Nebraska until 1936. It was then reorganized by A. E. Faulkner and associates, who became stockholders, but its corporate name was changed to Woodmen Central Life Insurance Company, and it was admitted in nine additional states in which Woodmen Accident was already admitted and had established an agency force who were selling accident insurance for Woodmen Accident and sickness insurance for Woodmen Assurance. Prior to its reorganization in 1936, Cornbelt Life Insurance Company had been in serious financial difficulty. Its surplus was impaired; it had no agents for sale of insurance; and it had actually ceased to sell insurance by direction of the Nebraska Department of Insurance. Following the addition of $73,000 of capital through A. E. Faulkner and associates and others, and the change of the name from Cornbelt Life Insurance Company to Woodmen Central Life Insurance Company, the Woodmen Accident Company permitted it to jointly use the agency force of Woodmen Accident together with Woodmen Assurance in states where Woodmen Central had entered to sell life insurance. On December 31, 1954, the life insurance in force with Woodmen Central was reinsured with Woodmen Accident under a reinsurance agreement, and Woodmen Central retired

from business and was dissolved by vote of its stockholders. Plaintiffs and the individual defendants are stockholders in Woodmen Central, which is also made a defendant herein. The primary controversy in the trial court and here is whether or not a value of $167,259 for alleged agency force of Woodmen Central should have been included in the purchase price fixed in the reinsurance agreement.

Defendants Edwin J. Faulkner, president, Richard L. Spangler, secretary, and Walter S. Henrion were officers and directors of Woodmen Central and at the same time were officers and directors of Woodmen Accident. Defendants Richard W. Faulkner and Joseph A. Spangler were directors of Woodmen Central and of Woodmen Accident. Defendants Victor L. Toft and Ervin F. Rucklos were not directors of Woodmen Accident but were officers and directors of Woodmen Central, and in February 1955, after its dissolution, they became directors of Woodmen Accident, but that is not controlling here. See Rettinger v. Pierpont, *supra.*

Plaintiffs are stockholders in Woodmen Central and own a total of 30 shares out of 19,491 shares of stock outstanding. Plaintiff Peters, the only plaintiff who appeared at the trial and testified, owned 10 shares, and other plaintiffs owned 20 shares. The individual defendants, their families, and associates owned 13,422 shares of stock in Woodmen Central, and if the sum of $167,259 as value of agency force had been added to the consideration paid by Woodmen Accident to Woodmen Central, then $115,174.19 of that amount, or $8.581 per share would have been added to the liquidation value of stock owned by defendants, their families, and associates, with only $257.43 added to the liquidation value for the total of 30 shares owned by plaintiffs.

For a number of years prior to 1954, Woodmen Assurance, Woodmen Central, and Woodmen Accident, as separate legal entitles, operated under an arrangement known as "Woodmen Group," under which they oc-

cupied offices in the same office building, but generally the combined personnel, equipment, and facilities operated on a functional basis. Expenses identified as that of a company were separately charged and paid directly by that company. Other expenses for the joint benefit of any two or all said companies were apportioned on an equitable basis. Salaries of officers were separately fixed and paid by each company. The same agents sold for all three companies but were licensed separately to write insurance for each company which paid the commissions and renewal commissions of such agents and contributed its proportionate share of their expenses.

However, in the 10 states in which Woodmen Central was admitted to sell insurance within 1 year after its reorganization in 1936, Woodmen Accident had 745 licensed agents. Of this number, Woodmen Central initially chose to license 303 of such agents to also write life insurance in those states. Its agents continued to write accident and sickness insurance for Woodmen Accident and Woodmen Assurance. About 18 years later, on December 31, 1954, when Woodmen Central reinsured its life insurance with Woodmen Accident, Woodmen Central had 321, or about the same number of agents licensed to write life insurance for it. Those agents were the same agents as had been licensed for selling accident and sickness insurance for Woodmen Accident and Woodmen Assurance, now merged and known as Woodmen Accident and Life Company. The principal earnings of such 321 agents in 1954 came from commissions earned from the sale of accident and sickness insurance as agents of Woodmen Accident and Woodmen Assurance. Some 53 of its agents had no earnings whatever in 1954 from Woodmen Central; 231 had total earnings of less than $600 in 1954 from Woodmen Central; and only 15 had total earnings of $3,000 or more in 1954 from Woodmen Central. All but 2 of those 15 were agents for Woodmen Accident prior to commencing the sale of insurance for Woodmen Central in 1936. In

the year 1954, Woodmen Accident issued 39,415 policies, or 91.36 percent, and Woodmen Central issued 3,724 policies, or 8.64 percent. The principal income from Woodmen Accident in 1954 was $7,670,701, or 82.06 percent, and from Woodmen Central was $1,677,016, or 17.94 percent. Such figures as to Woodmen Accident also include the policies issued and premiums received by Woodmen Assurance, in view of the fact that the merger of those two companies did not occur until December 31, 1954.

Early in 1954, preparatory steps were taken with a view to reorganization of the three Woodmen insurance corporations, and a contract was let for the construction of a new home office building. Measures were taken to effect the consummation of a merger between Woodmen Accident and Woodmen Assurance, and same was consummated under the name of Woodmen Accident and Life Company. At about the same time, preparations were made for the consummation of a reinsurance agreement between Woodmen Accident and Woodmen Central, which transaction is directly involved here.

In that connection, on December 31, 1936, Woodmen Central had a surplus deficit of $34,797.61, if provision were made for surplus notes, and in each year thereafter until December 31, 1948, said company continued to show a year-end surplus deficit after provision for surplus notes. A true surplus commenced to accumulate in 1949, but only reached an amount of any consequence when in the fall of 1953 surplus noteholders surrendered their notes for conversion into common stock of Woodmen Central, in conformity with options in said notes. Even then, Woodmen Central's surplus account was not sufficient to enable the company to be admitted in a number of states. In view of the company's surplus condition, no dividends were ever declared on the stock of Woodmen Central from 1936 through 1954, and evidently none could be declared in the near future without risk to financial soundness of

the business. Thus, many stockholders desired to be paid for their stock and use the money for their own enterprises. Sale of insurance by the company had declined substantially through each year of 1952 to 1954, inclusive. Rates and mortality tables had been changed, and competition became more intense. Also, the close relationship between the two mutual companies and Woodmen Central required a precise and careful allocation of expenses which otherwise was not acceptable to the insurance departments of some states. For such reasons, the directors of Woodmen Accident established a director's committee on March 4, 1954, hereinafter called "Requartte committee" for reorganization, with instructions to investigate the possibility and feasibility of making an offer to reinsure Woodmen Central's life insurance and evaluate its assets in order to consummate a reinsurance agreement whereby Woodmen Accident would reinsure Woodmen Central's insurance and said company would be dissolved. The Requartte committee consisted of H. J. Requartte, a lawyer with many years of legal, executive, and business experience in the insurance field; Burnham Yates, president of the First National Bank in Lincoln, with many years of experience in investment fields; George P. Abel, with many years experience in the building, material, construction, and insurance business; Thomas C. Woods, a lawyer with many years of experience in the legal, insurance, and business field; Walter W. White, a lawyer who was publisher of the Lincoln Star and had a wide experience in the business field including the purchase and merger of corporations; and Thomas H. Wake, president of Jones National Bank in Seward. Such committee consisted of more than a clear majority of the board of directors of the Woodmen Accident, and did not include any person who had any interest in or who was either an officer, director, or stockholder in Woodmen Central. At a later date the directors of Woodmen Central appointed a committee consisting of Victor L.

Toft, a businessman with many years of experience in the insurance field, who had full knowledge of Woodmen Central's affairs ever since it began operations in 1936, and Ervin F. Rucklos, a lawyer with years of experience in the insurance and business field. Neither Victor L. Toft nor Ervin F. Rucklos had any financial interest in or was either an officer or director of Woodmen Accident. The purpose of such committee was to study and consult with each other and the Requartte committee with regard to said proposed reinsurance agreement, and to assist in determining whether such agreement should be approved and accepted by Woodmen Central's stockholders. All of the committeemen aforesaid will be called by their last names.

Requartte was elected chairman of Woodmen Accident's reorganization committee but became ill in August 1954, and Yates became acting chairman. Prior thereto, such committee had largely completed certain of its purposes, including the merger of Woodmen Accident and Woodmen Assurance, and the change of Woodmen Accident's corporate name to Woodmen Accident and Life Company, and an enlargement of its powers to engage in the life insurance business. In addition, Mr. Haight, an Omaha consulting insurance actuary, had been employed by the Requartte committee and had made studies connected with valuation of the affairs and life insurance business of Woodmen Central. His basic valuation, which did not include any separate allowance to be made or paid for an agency force of Woodmen Central, had been mailed to Requartte on May 25, 1954, and Requartte on June 4, 1954, had mailed a copy of Haight's report thereof to one Tiffany, a Chicago consulting insurance actuary, for analysis and comment. Such analysis and comment by Tiffany on Haight's valuation was mailed back to Requartte on August 13, 1954. Tiffany's formula for the valuation was somewhat different from that of Haight and it recommended placing a valuation on an agency force of Woodmen Central. On

September 8, 1954, Yates, as acting chairman of the Requartte committee, arranged a conference in Chicago with Tiffany and Haight to consider and discuss Haight's basic valuation study of May 25, 1954, and Tiffany's comment and report thereon of August 13, 1954. At that time, Yates was not informed of the true facts with relation to Woodmen Central's agency situation, and no information was furnished Tiffany or Haight with regard thereto. Thereafter, on September 11, 1954, Yates wrote Tiffany to confirm his understanding of the discussion at the Chicago meeting, and Tiffany verified same by letter September 17, 1954. Yates' letter, as summarized, stated that Haight had not included anything in his calculations as a valuation for a Woodmen Central agency plant, but Tiffany seemed to feel that it would be proper and desirable to include same, and that failure to do so might be a weakness in the transaction. Haight, upon his return from Chicago, prepared a memorandum to Yates in which he theorized upon values that might be added if an agency force value was to be included, as suggested by Tiffany.

Yates then wrote to H. Lewis Reitz, Raymond R. Haffner, and B. B. Gribble, hereinafter called by their last names, all of whom were expert insurance actuaries or executives with different insurance companies, inviting them to come to Lincoln for a conference with the Requartte committee and Haight on September 20, 1954, in conformity with prior arrangements theretofore made by president Edwin J. Faulkner. Prior to coming to Lincoln, various studies and reports, including those of Haight and Tiffany, were sent to such actuaries, who studied them, then attended a September 20, 1954, meeting with Yates, Abel, Wake, and Haight. Thereat certain changes were agreed upon and embodied in a letter from Haight to Yates dated September 21, 1954. There no information was made available to the actuaries with regard to Woodmen Central agency background and interrelation with Woodmen Accident and

Woodmen Assurance, and the valuation of agency force was made on the basis that would ordinarily be made for a company with an agency force of its own. Haight then made a revised valuation study dated September 30, 1954, to carry out conclusions reached by the consulting actuaries at their meeting on September 20, 1954, which reflected, among other revisions, a proposed value of $167,259 to be added for Woodmen Central agency force. That revised valuation study was presented to the Requartte committee, and Yates made a written report to the directors of Woodmen Accident on October 15, 1954, approving such revised valuation.

Thereafter, on October 25, 1954, members of the Requartte committee met with Haight and officers of Woodmen Accident, where Yates went over, step by step, the report and proposal developed as a result of deliberation with the consulting actuaries on September 20, 1954. When Yates reached the agency value proposal, a question was raised whether that was a proper value, that is, whether a value could properly be placed upon agency force. The officers of the Woodmen Accident pointed out the fact that agents licensed to place their life insurance with Woodmen Central were men who were Woodmen Accident agents; that they drew a majority of their earnings from that company, which had recruited and developed their opportunity to earn through such company; that they were all originally licensed to represent that company; that they regarded themselves as that company's agents; that it was impossible for Woodmen Central to give Woodmen Accident that which it already had; and that under the circumstances, Woodmen Central would not have been able to deliver the services of those agents to Woodmen Accident or to any other company. There Abel, a member of the Requartte committee, said: "We can't possibly include in this offer a separate consideration for agency plant," and after full discussion, with all present participating, it was unanimously concluded and

agreed that Woodmen Accident's offer should not include any separate value for agency plant.

In this trial, Yates testified that he had not consulted with any officers of either company prior to October 15, 1954, with regard to the subject matter of the committee's report of that date, and that after the explanation given at the October 25, 1954, meeting with reference to the agency situation, it was his business judgment and that of the rest of the committee, after hearing the facts presented, that they could not ascribe a value to agency plant and that he, Yates, could not in good conscience include any such value in the offer to Woodmen Central. White testified that it was his judgment that Woodmen Central had nothing to deliver to Woodmen Accident as an agency plant. Abel testified, "It occurred to me that they didn't have, the Woodmen Central Life didn't possess, anything that we already didn't have, and I didn't see how we could justify paying anying for it. * * * I made up my mind that they had nothing, the company they were going to buy, as far as the agency force was concerned didn't have anything that wasn't already possessed" by Woodmen Accident. It was then unanimously agreed that such was the fact and that no allowance should be included for agency force. Haight, the actuary, having attended that meeting and hearing the factual discussion and that decision, then agreed therewith.

At conclusion of the October 25, 1954, Requartte committee meeting, Yates prepared a "Memorandum for the File," which summarized at length the factual situation and disclosed the reasons for the decision made at such meeting that no value for agency plant could be included in Woodmen Accident's offer. The reasons in substance were that the agency organization of Woodmen Accident and Woodmen Central were identical in states where the latter operated; that Woodmen Accident could not appropriately assign a value to an agency plant of Woodmen Central when Woodmen Accident al-

ready enjoyed the representation of that same agency; that Woodmen Central had nothing to sell that Woodmen Accident did not already possess; and that a separate consideration to be paid for agency plant could not be supported.

In the afternoon of October 25, 1954, the Requartte committee held a special meeting in Requartte's home, where Yates, Requartte, Abel, Wake, and Woods were present, which constituted a quorum of the Woodmen Accident board, with all members of the Requartte committee present except White. There the proposed offer to purchase the furniture, fixtures, equipment, and supplies of Woodmen Central, and to reinsure its life insurance business without any separate allowance or payment for agency force, was authorized to be made to Woodmen Central. A copy of the minutes of such meeting appears in the record.

After March 4, 1954, when the Requartte committee was appointed, Toft and Rucklos, who later became members of Woodmen Central's reorganization committee, were kept informed of the developments regarding valuation studies of the life insurance business of Woodmen Central. On October 18, 1954, the president of the company wrote them that there would be a formal proposal made of a reorganization agreement by Woodmen Accident, which should be considered by them as a committee not later than Tuesday, October 26, 1954. Toft and Rucklos had no connection officially or otherwise with Woodmen Accident, and as a committee for Woodmen Central they were to make recommendations to a meeting of its board of directors scheduled for 3 p. m., October 26, 1954. Within a day or two after October 18, 1954, Toft and Rucklos had received for examination and study, and had studied, every document, including every report, letter, and memorandum pertaining to values, including agency force, which had been in the hands of the Requartte committee and Woodmen Accident between May 25, 1954, and September

30, 1954; and on October 25, 1954, they were notified of the decision made that day that the offer to be made Woodmen Central did not include a separate consideration for agency force. Toft and Rucklos conferred over the telephone on October 22 and 25, 1954, and met for a conference at 2 p. m., October 26, 1954, to determine what their recommendation would be to the full board of Woodmen Central's directors with regard to Woodmen Accident's proposal. Following the conference, the entire board of directors of Woodmen Central met as scheduled at 3 p. m., on October 26, 1954, to consider the report of Toft and Rucklos, whereat among other documents the "Memorandum for the File" prepared by Yates, as heretofore mentioned, was presented and considered, and decision was made by the directors concerning the exclusion of any value for agency force. The proposed reinsurance agreement was also presented and discussed, together with a report of Toft and Rucklos, recommending acceptance of Woodmen Accident's offer, and the directors, with full knowledge of the facts, then unanimously voted to approve and accept Woodmen Accident's offer. In doing so, without including the separate amount of $167,259 for agency force, as had been earlier considered during negotiations, each director of Woodmen Central who had voted took a substantial reduction in the amount he would receive as a stockholder in Woodmen Central.

Toft had theretofore continuously served Woodmen Central since January 28, 1936, as an officer and director, and he had at all times since had full and accurate knowledge of the affairs of Woodmen Central during the succeeding years. He testified that in good conscience he could not approve that a value should be included for agency force which was of such a nature that it would be impossible to attach a value to it; that having lived with the situation for some 18 years, he was fully conscious of the exact nature of the agency force; that no agency force could possibly be delivered

to Woodmen Accident or to any other company; that he had a high regard for the integrity and judgment of Haight and Gribble, and faith and confidence in the business integrity and acumen of officers of the two companies; and that in view of the substantial stockholdings of officers and directors of Woodmen Central, it would be incredible that they should accept about $100,000 less than they could have received had their consciences permitted them to put a valuation on agency force. Upon being asked his reason for not employing other lawyers for the committee, he replied that it was a business matter and not a legal matter, and that he had every confidence in William Aitken with whom he had worked for some 18 years. In that connection, it will be remembered that Requartte, Woods, White, and Rucklos were also lawyers who gave their services during the transaction prior to this litigation, and that thereafter other counsel also appeared for different defendants whose interests plaintiffs claim were adverse. Toft was asked why the committee did not seek offers from other insurance companies. In such respect he testified, and his testimony is substantially corroborated, that shopping of an insurance company on the market is a very detrimental thing and most destructive of the integrity of such a company. Rucklos testified that he approved the Woodmen Accident offer without any value for agency plant because his opinion was that under the circumstances it had no agency which could be delivered to Woodmen Accident.

One Harold A. Reise, a consulting actuary of Chicago, testified in a deposition offered by plaintiffs that the agency force of Woodmen Central was unusually good from the standpoint of persistency; that in evaluating the assets of a stock life insurance company it was proper to place a separate value on its agency force; and that Haight's calculations contained in his later report were appropriate, but that his valuation of agency force at $167,259 was a minimum one. He testified that his in-

formation was obtained from a review of certain described documents and exhibits appearing in the record, interrogatories submitted, and answers thereto, and an examination of the 1957 edition of Best's Unique Manual Digest with reference to Woodmen Central's progress, capital surplus, and assets, but he admitted that nothing he learned therefrom entered into his judgment or opinion. It is sufficient to say that the exhibits and documents which he reviewed to arrive at his judgment or opinion therein did not disclose the background of the agency situation and relations heretofore set forth.

Reitz, an insurance executive from Houston, Texas, called as a witness by defendants, testified that in his original consideration of a value for agency force on September 20, 1954, he had not been furnished information with regard to the background of the agents or agency force, the method of licensing agents, or their relation with Woodmen Accident, and other facts pertaining thereto; that his suggested valuation of agency force made at the conference with Haight, Haffner, Gribble, and Yates on September 20, 1954, was made on the basis that Woodmen Central had an independent agency organization which was its property; and that having received a copy of the "Memorandum for the File" from Woodmen Accident, which disclosed that its committee had excluded a separate agency force valuation and given reasons therefor, he agreed with the conclusions therein, and said, "Well, as it is outlined here in the light of these circumstances, I think the valuation committee was correct in omitting a valuation for agency organization."

Haffner, an insurance actuary, called as a witness for defendants, testified that at the initial conference of September 20, 1954, they made the valuation on the basis that would ordinarily be made for a company with an agency plant of its own, but that having been in the courtroom and heard the facts, and having read the "Memorandum for the File" dated October 25, 1954,

he agreed with the report, the opinion given by Reitz, and the judgment of the Requartte committee and the board of directors of Woodmen Central that a separate valuation for agency force should be excluded. In other words, he testified that he had changed his original opinion as expressed in the September 20, 1954, conference report, after additional facts became known to him during the trial.

Gribble, an insurance actuary called by defendants, also testified that he had no information as to the background and relations with regard to the agency force on September 20, 1954, and that with such additional facts made known to him during the trial, including the "Memorandum for the File" on October 25, 1954, he approved and agreed with the conclusions that value for agency force should not be included in Woodmen Accident's offer. Plaintiffs attempted to impeach his testimony in rebuttal, but his credibility was a question for the trial court.

On November 3, 1954, a joint application was filed by Woodmen Accident and Woodmen Central with the Department of Insurance seeking approval of their reinsurance agreement. A copy thereof, together with certified copies of resolutions of the board of directors of each company authorizing such action and approving the agreement, were attached to the application. On or about the same date, copies of every document or memorandum, including all correspondence that in any way related to the insurance transaction and the manner in which the purchase price was arrived at, all of which we have heretofore mentioned, were delivered to and filed with the Department of Insurance in support of such joint application.

The Director of Insurance then caused an investigation and examination to be made and assigned two department actuarial examiners to investigate the value of the insurance and assets of Woodmen Central. They did so and made a report thereof to the Director on

November 10, 1954, wherein they approved the proposed reinsurance agreement.

On November 12, 1954, thereafter, the Director signed an order approving the proposed reinsurance agreement, subject to the approval of the policyholders of Woodmen Accident and the stockholders of Woodmen Central, at meetings to be held by them for the purpose of considering the proposed reinsurance agreement.

On December 21, 1954, the Director filed a supplemental and final order finding that approval had been made by the policyholders of Woodmen Accident and the stockholders of Woodmen Central, as required in his order of November 12, 1954, and that the reinsurance was effective in accord with its terms. No appeal was taken either from the order of November 12, 1954, or from the order of December 21, 1954, made by the Director of Insurance.

In that connection, on November 19, 1954, the president of Woodmen Accident wrote and mailed postpaid, a letter to every stockholder of record in Woodmen Central, notifying them that there would be a special meeting of such stockholders on December 20, 1954. A copy of the original order of the Department of Insurance, the reinsurance agreement, and a form of proxy were enclosed. The president's letter contained detailed information concerning the reinsurance proposal; the retirement of the company from the insurance business; the proposed liquidation of Woodmen Central; and the reasons for such proposals. The letter set forth in detail the basis of the purchase price and the manner in which it was computed, together with an estimate of the proposed total dollar consideration for the insurance in force, as of December 31, 1954, and the value of the furniture, fixtures, equipment, and supplies, together with the estimated amount of liquidating dividends of about $50 per share which would be realized and paid to the stockholders. In that connection, a total of $55 per share had been declared and largely

paid out to the stockholders of Woodmen Central as the first two liquidating dividends when plaintiffs' action was filed. The president's letter specifically pointed out that Woodmen Central's investment in agency force "* * * is not believed to be a recoverable item which could be reflected in the consideration proposed in the Reinsurance Agreement," which shows that it was not so reflected.

Out of a total of 19,491 shares of outstanding stock of Woodmen Central, 17,784 shares, or 91.24 percent of the total stock, were represented in person or by proxy at the meeting on December 20, 1954, to vote on the reinsurance proposal made by Woodmen Accident. Ballots were distributed, and following voting by ballot the secretary reported that ballots representing 17,784 shares had been voted in favor of the preamble and resolution for approval and adoption of the reinsurance agreement, and that no ballots had been voted against it. In that connection, plaintiffs complained that language of the proxy forms mailed to the stockholders was only affirmative in character, but no authority is cited in condemnation thereof, and under the circumstances presented here, we consider that fact to be of no consequence in arriving at a decision of the issues presented.

On February 23, 1955, at the first annual meeting of stockholders of Woodmen Central after the special meeting of December 20, 1954, some 16,061 shares of stock were represented in person or by proxy out of a total of 19,491 outstanding shares. The minutes of the December 20, 1954, meeting were there read, ratified, confirmed, and approved unanimously after the president had presented and read a detailed report on corporate actions taken during the preceding year; details of consummation of the reinsurance agreement; the proposed withdrawal of Woodmen Central from states in which it had been operating; and a proposal to dissolve and distribute assets of the company, which report was thereupon approved and adopted unanimously

by vote of all stockholders represented, and same was ordered filed with the minutes of the meeting. Rucklos, after a discussion of the effect of the reinsurance agreement and the future of the company, moved that the company be dissolved and that a special meeting of the board of directors be held to further that action on the same date. His motion was adopted unanimously by the stockholders, and the directors were reelected by unanimous vote of the stockholders. Plaintiff Peters was present at that meeting, but testified that he stood pat and did not vote. At said special meeting of the directors held on that same date they adopted a resolution declaring it advisable for the company to be dissolved and calling a special meeting of stockholders for March 28, 1955, to take action on the proposal to dissolve. At such special meeting on March 28, 1955, there were 17,581 shares of stock represented in person and by proxy out of 19,491 shares outstanding, and the resolutions for dissolution of the company and for a partial distribution of $25 per share as first liquidating dividends payable to stockholders July 1, 1955, were carried unanimously. In addition to the usual notice of that meeting by the secretary, a letter from the president was enclosed, detailing the action that was to be considered at the meeting relating to dissolution and liquidation and the amount of liquidating dividends contemplated. A copy of that letter was attached to the minutes of the meeting. Plaintiff Peters was not present at that meeting.

At the annual meeting held on February 21, 1956, there were 17,260 shares of stock represented in person or by proxy. Thereat the minutes of the last annual meeting of the stockholders held on February 23, 1955, and the minutes of the special meeting of stockholders held on March 28, 1955, were read, presented, ratified, confirmed, and approved by unanimous vote of all stockholders present or represented, and directors were reelected by unanimous vote of said stockholders. Plain-

tiff Peters was also admittedly present at that meeting, but testified that he stood pat and didn't vote. There the president again made a detailed report of actions taken during the preceding year with reference to the dissolution of the company, distribution of the first liquidating dividend of $30 a share on June 18, 1955, distribution of a second dividend of $25 a share on February 15, 1956, and a proposed deferment of the final dividend distribution until final clearance could be obtained concerning income tax obligations. He also reported upon examination of the company, and the reinsurance agreement by the Department of Insurance, and such report was attached to the minutes of the meeting.

On September 22, 1955, following the annual meeting on February 23, 1955, and the special meeting on March. 28, 1955, but prior to the annual meeting of February 21, 1956, plaintiff Peters wrote the Woodmen Accident requesting additional information regarding the reinsurance transaction. The president replied on September 27, 1955, summarizing the transaction, advising him that he would ultimately receive about $60 a share for each of his 10 shares of stock upon completion of liquidation, and offering to discuss the matter further with him and answer any question at any mutually convenient time. In the meantime, plaintiff Peters never has surrendered his stock or accepted payment of his dividends. In that connection, defendants alleged that by reason of the foregoing alleged affirmative action taken by Peters, he was estopped to maintain this action; that plaintiffs' ownership of stock constituted a trifling interest which will not sustain the action; and that by failure to make timely demand, laches had barred plaintiffs' action. There are authorities from this and other jurisdictions which give defendants some reason to make such claims, but we prefer to put final decision on other grounds. In that connection, we conclude that the evidence is overwhelmingly clear and convincing that the

reinsurance agreement was fair, just, and adequate in every material respect; that there was no fraud, deception, concealment, or misrepresentation of fact or overreaching, plan, scheme, or conspiracy to cheat or defraud the stockholders of Woodmen Central or said company, or practiced in connection with consummation of the reinsurance agreement; and that prior to its consummation plaintiffs and all other stockholders of Woodmen Central and the Department of Insurance as well were given full, true, complete, and adequate information and notice concerning every material step involved in the proposed reinsurance agreement, including notice and information that no separate and additional amount was included in the consideration proposed in the reinsurance agreement for agency force of Woodmen Central because it never had any separate agency force deliverable by it as such to Woodmen Accident or to any other purchaser of its insurance or assets.

In that connection, plaintiffs argued that actuaries Reitz, Haffner, and Gribble, as witnesses called by defendants, had changed their stories concerning valuation of the agency plant and that such testimony should be discredited as a matter of law and disregarded. We do not agree. The record discloses that their previous approval of report or memorandum containing or proposing inclusion of a separate agency valuation was predicated upon an erroneous assumption and without having full information regarding the related agency facts. As witnesses at the trial, they simply explained that situation and testified that upon having learned of the facts with relation to the agency force, they had changed their opinions and agreed that a separate agency valuation should have been excluded from the consideration proposed in the reinsurance agreement. This is not a case wherein a party without reasonable explanation testified to facts materially different concerning a vital issue than had previously been testified to by him under oath in another action, the change

clearly being made to meet the exigencies of the pending action which may require that the evidence be discredited as a matter of law and disregarded. Authorities relied upon by plaintiffs are entirely distinguishable. The law applicable here appears in 98 C. J. S., Witnesses, § 621, p. 636, whereat, citing authorities, it is said: "Where evidence of a witness' prior evaluation of certain property, inconsistent with its present estimate, is introduced, the witness may explain the circumstances of his former evaluation and state why he now testifies differently."

At most, the report or memorandum previously approved by Reitz, Haffner, and Gribble were only extrajudicial statements which were not conclusive but might be explained, rebutted, or contradicted, and thereafter given such weight as the trier of facts deemed them entitled. See Dorn v. Sturges, 157 Neb. 491, 59 N. W. 2d 751.

For reasons heretofore stated, we conclude that the judgment of the trial court should be and hereby is affirmed. All costs are taxed to plaintiffs.

AFFIRMED.