Ray S. McKEEMAN, Plaintiff,

v.

COMMERCIAL CREDIT EQUIPMENT CORP., a Corporation, Defendant.

COMMERCIAL CREDIT EQUIPMENT CORP., a Corporation, Plaintiff,

v.

A. W. SCOBODA, d/b/a Norfolk Farm Equipment Company, Defendant and Third-Party Plaintiff,

v.

Ray S. McKEEMAN, Third-Party Defendant.

Civ. Nos. 03086, 03291.

United States District Court, D. Nebraska.

Sept. 3, 1970.

Hans J. Holtorf, Leland K. Kovarik, Jr., Gering, Neb., for Ray S. McKeeman.

Peter E. Marchetti, Omaha, Neb., Richard P. Nelson, Lincoln, Neb., for Commercial Credit Equipment Corp.

Frederick M. Deutch, Norfolk, Neb., Malcolm D. Young, Omaha, Neb., for A. W. Scoboda d/b/a Norfolk Farm Equipment Company.

VAN PELT, District Judge.

This is an action for a declaratory judgment, originally filed in the District Court of Scotts Bluff County, Nebraska, in which plaintiff prays for a judgment construing an agreement entered into with Commercial Credit Equipment Corp. (hereinafter referred to as CCEC) as a usurious loan transaction, in violation of Nebraska law.[1] Further, plaintiff asks the court to declare the rights of the parties under this agreement, and to restrain the defendant from collecting more than the principal of this alleged loan, and from repossessing any properties allegedly purchased by plaintiff, in connection with the agreement. On defendant's petition (filing #1) the case was removed to federal court (Civ. 03086). Plaintiff is a citizen of Scotts Bluff County, Nebraska, and defendant CCEC is a citizen of Maryland. The amount in controversy exceeds $10,000.

Plaintiff alleges that in 1963, he purchased certain silos and other farm equipment from Norfolk Farm Equipment Company (hereafter referred to as NFEC), receiving a statement for the full purchase price of $42,819.66. Plaintiff alleged that he paid $567.90 down, leaving a balance due of $42,251.76. Plaintiff further alleges that he entered into an agreement with CCEC in January, 1964, designated by CCEC as a "lease". By the terms of this agreement, plaintiff agreed to pay CCEC $58,188.06 as lease payments in eighty-four monthly installments.[2]

In its answer defendant denies that plaintiff had ever purchased the silos and related equipment from NFEC, but alleges instead that the equipment was purchased by CCEC. CCEC specifically denies that any part of these payments under the "lease" constitutes interest, and alleges that they are lease payments only.[3]

Subsequently, defendant was granted leave to file a counterclaim (filing #10) in which it alleges that plaintiff had failed to continue his rental payments and was in default of the lease. Defendant prays for $36,153.85 as liquidated damages. Defendant then filed a separate action (Civ. 03291) against NFEC for breach of a guarantee, alleging that

---

1. Neb.Rev.Stat. § 45-101 (Reissue 1968) provides as follows: "Any rate of interest which may be agreed upon, not exceeding nine dollars per year upon one hundred dollars, shall be valid upon any loan or forbearance of money, goods or things in action and may be taken yearly, for any shorter period or in advance, if so expressly agreed; * * * *"

   Section 45-105 provides that a finding that the contract is usurious does not make the contract void, but merely limits the recovery to the principal amount without interest.

2. In October, 1965, the lease was amended for the first time, pursuant to its terms. The amendment provided for a total "lease" amount of $46,744.80, payable in twelve monthly installments of $500.00, 57 monthly installments of $700.00, and a final payment of $844.80. Plaintiff had paid a total of $14,901.09 at the time of this first amendment. In January,

1967, the "lease" was again amended to provide for ninety-five consecutive monthly payments of $491.22, and a final payment of $491.95, making a total due under the amended "lease" of $47,157.85. At the time of the second amendment plaintiff had already paid in $22,400.76. The total face value of the twice-amended lease is $69,558.61.

3. Exhibit two, introduced and received in evidence, indicates that in November, 1963, a statement for the full value of the silos and related equipment was sent to plaintiff. The structures were completed and were erected on plaintiff's land prior to receiving this statement. In January, 1964, an identical statement, Exhibit twelve, was mailed to CCEC. This statement was then paid by CCEC. Subsequently, the "lease" agreement was entered into between McKeeman and CCEC.

NFEC had signed the written guarantee pursuant to which the full performance of McKeeman under the terms of the lease was assured, and prayed for $36,153.85 as a result of McKeeman's breach. In its answer, NFEC denies the guarantee alleging that defendant CCEC negligently and fraudulently induced the signing of the guarantee by representing that the "lease" entered into between McKeeman and CCEC was not a usurious loan. By amended third-party complaint, NFEC alleges that McKeeman and CCEC induced NFEC to sign the written guarantee, and that McKeeman promised to hold NFEC harmless from any liability on the guarantee. NFEC further alleges that the subsequent amendments of 1965 and 1967 between McKeeman and CCEC were unknown to it, prejudicial to its interests, and operate as a release on the guaranty as a matter of law.

The cases were consolidated and set for trial to a jury. On the day the jury trial was to commence, the parties waived a jury and agreed to try the case to the court. Evidence was presented by all parties, briefs have been filed and the case is now ready for decision.

The overriding issue controlling disposition of this lawsuit is whether the agreement entered into between plaintiff McKeeman and defendant CCEC is a lease, as it purports to be, or whether it is in fact a loan in disguise at a rate of interest in excess of the statutory maximum of nine percent. For the reasons which follow, the court concludes in Civil No. 03086, that the document entitled a "lease" is in fact a loan at a rate of interest in excess of the Nebraska usury laws, and that plaintiff McKeeman is entitled to judgment in his favor.

The document itself, signed by both McKeeman and a representative of CCEC, is captioned "Lease". Its opening sentence is as follows:

"This Lease, between Commercial Credit Equipment Corp., Lessor, herein called CCEC, A Delaware Corporation with an office at 300 St. Paul Place, Baltimore, Maryland and Ray McKeeman, Lessee, herein called User, of Gering, Scottsbluff (sic) [County], Nebraska."

The document continues:

"1. CCEC hereby leases to User, upon the terms and conditions herein contained, the following described property, hereinafter called Units."

A description of the property follows. Paragraph sixteen describes the miscellaneous provisions of the agreement:

"16.1 This agreement is, and is intended to be a lease, and User does not acquire hereby any right, title or interest whatsoever, legal or equitable, in or to any of the Units, or to the proceeds of the sale of any Units, except its interest as lessee hereunder.

"16.2 CCEC warrants that, if User performs its obligations under this lease, User shall peaceably and quietly hold, possess and use the Units during the entire lease term, free from any interference or hindrance.

"16.3 The relationship between CCEC and User shall always and only be that of lessor and lessee. User shall never at any time during the term of this Lease for any purpose whatsoever be or become the agent of CCEC, and CCEC shall not be responsible for the acts or omissions of User, or its agents.

"16.4 CCEC's rights and remedies with respect to any of the terms and conditions of this Lease shall be cumulative and not exclusive, and shall be in addition to all other rights and remedies in its favor.

"16.5 CCEC's failure to enforce strictly any provisions of this Lease shall not be construed as a waiver thereof or as excusing User from future performance.

"16.6 The invalidity of any portion of this Lease shall not affect the remaining valid portions thereof.

"16.7 User specifically agrees that Units shall at all times and for all purposes be considered personal prop-

erty, notwithstanding the manner or mode of attachment to real estate.

"16.8 All notices shall be binding upon the parties hereto if sent to the address set forth herein (unless a subsequent address has been furnished, by certified mail, by one party to the other).

"16.9 This Lease constitutes the entire agreement between the parties hereto. Any change or modification to this Lease must be in writing and signed by the parties hereto."

The document consists of additional perfunctory sections attempting to clarify its nature, some of which are discussed *infra*.

At trial, evidence was introduced indicating that both McKeeman and NFEC, as well as other farmers and implement dealers, were advised by CCEC representatives that title to the structures erected on the farmers' land could be purchased upon termination of the "lease" by the User for one dollar. The evidence was in two forms. Oral testimony was received from McKeeman, Mr. Scoboda, owner of NFEC, and Miss Valarie Marlowe, Mr. Scoboda's secretary, as to statements relating to obtaining title made by representatives of CCEC. Additionally, a tape recording of a speech given at a conference of farmers and dealers by one of CCEC's representatives in 1964 was introduced. Defendant contends that introduction of this evidence was error. For reasons which follow, the court disagrees and holds that the evidence was admissible for the purpose for which it was received.

## THE ORAL TESTIMONY

Plaintiff McKeeman testified at trial that he had several conversations with the sales representative from NFEC, and a conversation with a field representative from CCEC. These conversations focused upon the "lease" in question, and it was represented to McKeeman that title to the equipment could be obtained at the expiration of the lease by paying one dollar. Mr. Scoboda, owner of NFEC, from whom the equipment was purchased, testified that he had been told by agents of CCEC that at the end of the lease term, the property could be purchased for one dollar. Mr. Scoboda's secretary testified that she had overheard several conversations between Mr. Scoboda and representatives of CCEC to that same effect.

Defendant objected to the introduction of this testimony on the ground, *inter alia*, that it was in violation of the Parol Evidence Rule.[4] Defendant in its brief has argued adamantly that the agreement entered into between McKeeman and itself is self-explanatory and constitutes the entire contract. Since there is no mention of paying a dollar and receiving title upon the expiration of the lease, and in light of sections 16.1–16.9, *supra*, any such evidence is in direct contrast to the written "lease" and therefore inadmissible.

The rule in Nebraska has long been established that courts will, in cases involving usury allegations, look through the form of the transaction to its substance, for it is the intent rather than the form of the transaction which is deemed controlling. Lloyd v. Gutgsell, 175 Neb. 775, 124 N.W.2d 198 (1963); General Motors Acceptance Corp. v. Mackrill, 175 Neb. 631, 122 N.W.2d 742 (1963); Commonwealth Co. v. Fauver, 169 Neb. 795, 101 N.W.2d 150 (1960); State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N.W.2d 215 (1956); State ex rel. Spillman v. Central Purchasing Co., 118 Neb. 383, 225 N.W. 46 (1929). See also 45 Am.Jur.2d, Interest and Usury, § 355 (1969). The reason

---

4. Defendant strongly contends that no agency relationship existed between CCEC and NFEC, and that if anything Scoboda was the agent of plaintiff McKeeman. Resolution of this particular issue is in no way dispositive of the instant case, however. The quality of the statements or, more properly, their true nature as admissions, is controlling. They are clearly admissible regardless of whether any agency relationship be established.

for the rule is clear: if the rule were otherwise the purpose of forbidding the taking of usury under any cover or pretext would be defeated by those able to construct instruments designed to forestall any subsequent inquiry respecting this issue. It is well to remember that in the end, the fundamental inquiry is to discern what actually occurred between the parties, and the characterization of the transaction by them is merely secondary. Commercial Discount Co. v. Rutledge, 297 F.2d 370 (10th Cir. 1961).

Defendant misconstrues the operation of the Parol Evidence Rule in the case at bar. The Rule operates to define the written transaction itself, and to limit that transaction to the explicit, written terms.

"It denies effectiveness as part of the transaction to expressions outside the writing, but it has no bearing at all upon the question whether the transaction embodied in the writing is valid or legally effective." C. McCormick, Handbook of the Law of Evidence, § 222, at 449 (1954)

The evidence here adduced in the form of oral testimony is offered not for the purpose of being used as a part of the contract, nor for varying the terms of the contract, as defendant contends. Its purpose is rather that of demonstrating that the transaction embodied in the writing is not what it purports to be. Plaintiff is not attempting to vary the contractual terms by the introduction of this evidence. He is merely attempting to demonstrate that the purported "lease" is not a lease at all, but is rather a loan, and as such it is in violation of the maximum interest rates under the state usury laws. The Court of Appeals for the Eighth Circuit has succinctly stated this distinction:

"The objection to parol evidence does not apply where it is offered not for the purpose of contradicting or varying the effect of a written contract of admitted authority, but to disprove the legal existence *or rebut the operation of the instrument,* \* \* \*" Pet Milk Co. v. Boland, 175 F.2d 151, 156 (8th Cir. 1949) (citations omitted) (emphasis added).

The Nebraska rule is in accord with this statement.[5]

■ In light of this testimony as to defendant's admissions through its representatives, the conclusion seems inescapable that the "lease" is, in fact, a subterfuge for a loan transaction which reduces to a rate of interest in excess of that allowed by statute. The statements are not subject to the prohibition of the Parol Evidence Rule, and are admissible as proof of the true nature of the purported lease agreement.[6]

5. In State ex rel. Beck v. Associates Discount Corp., *supra,* it was said that "[a]s usury is generally accompanied by subterfuge and circumvention of one kind or another to present the color of legality, it is the duty of the court to examine the substance of the transaction as well as its form, *and the right to relief will not be denied because parol proof of the usurious character of the transaction contradicts a written instrument." Id.* at 709, 77 N.W.2d at 230–231 (citations omitted) (emphasis added). Contrary to the defendant's suggestion that this rule was modified in Hansen v. Commonwealth Company, 174 Neb. 70, 115 N.W.2d 895 (1962), so that parol evidence is only admissible as it relates to variation or contradiction of the express terms of the contract relating to consideration, the court is of the opinion that (1) *Hansen* is readily distinguishable on its facts, and

(2) *Hansen* does not modify the rule announced in *Beck.*

6. Defendant cites the recent decision of In the Matter of Gresham, Bankrupt, 311 F.Supp. 974 (E.D.Va.1970), in which the district court affirmed the opinion of the referee in bankruptcy that a similar, if not identical, "lease" was a valid lease agreement. In that action CCEC sought to reclaim three silo-type structures with related equipment, alleging that they were installed pursuant to a lease agreement wherein title was reserved to CCEC and did not pass to the Trustee in Bankruptcy upon the filing of the bankruptcy petition. The trustee opposed the action of CCEC on the ground that the "lease" was actually a conditional sales contract, which was unrecorded, and that the title to the silos vested in the trustee.

## THE TAPE RECORDING

A tape recording was introduced into evidence and played at trial while Mr. Scoboda was on the witness stand. He testified that on several occasions sales meetings had taken place at which representatives of CCEC addressed prospective purchasers, and farm implement dealers such as NFEC. Mr. Scoboda further testified that he recorded many of these meetings and speeches in order that customers not in attendance could hear directly, in a manner of speaking, what CCEC had to say as to how the customer's needs could best be served. Playing of the tape recordings for customers would also save him the trouble of attempting to repeat what he had been told in detail. He further testified that these tapes were used a good deal in sales talk and promotional activities.

Mr. Scoboda testified that a meeting was held in Scottsbluff, Nebraska, on February 3, 1964, and while he was in attendance at that meeting he made the recording in question. He also testified that he operated the recorder in making the tape, as such was his usual practice. He identified it by brand name. He further testified there had been no change made in the tape in any way or manner, and that it was an accurate and true portrayal of the events which did transpire at the meeting. He further testified that he was able to identify the voices on the tape, and proceeded to do so when it was played. Mr. Scoboda also testified that he had recalled the existence of the tape, that it had been in his possession, and he produced it for his attorney shortly before the case came to trial. He stated he had played it again prior to testifying, and that he recalled the event in question.

On cross-examination, Mr. Scoboda testified that the recording had been out of his personal possession on several occasions as it had been taken to be played for prospective customers. Defendant urges that it was error to admit the recording, because an improper foundation had been laid for its admission. Specifically, defendant asserts that (1) the authenticity and correctness of the recording were not established, and (2) the recording was shown to have not been properly preserved since it was out of Scoboda's possession on several occasions.

Although it has not specifically been passed upon by Nebraska courts, the generally accepted rule, conceded by all parties, is that mechanically recorded conversations may be used not only as proof of admissions but also to impeach the credibility of a witness. United States v. McKeever, 169 F.Supp. 426 (S.D.N.Y.1958); Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49 (1956), cert. denied, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956); Solomon, Inc. v. Edgar, 92 Ga.App. 207, 88 S.E.2d 167 (1955); cf. Fountain v. United States, 384 F.2d 624 (5th Cir. 1967), cert. denied, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968). See also, 32 C.J.S. Evidence § 732(3) (1964). Here the recording was clearly offered solely for the former purpose. "Their competency as evidence [the tape recordings] derives from their reliability as a

The referee's opinion distinguished between a lease, in which only the use of the designated property is contemplated for a specified period of time, and a conditional sale in which title ultimately passes to the buyer. Evidence was excluded purporting to show the bankrupt's *intent* at the time the agreement was entered into between the parties, on the ground that its admission violated the Parol Evidence Rule. The case is distinguishable on that ground because there was no attempt to introduce any evidence of intent on the part of plaintiff when he entered into the agreement and on the ground that here there is an allegation of usury. The evidence introduced in this case related to admissions by CCEC's representatives, and was introduced for the purpose of demonstrating the true operative effect of the instrument involved. With respect to that part of the opinion which concludes that the document is a complete and valid lease, with no option to purchase in the lessee, the court must respectfully disagree. The reasons therefor are discussed *infra*.

means of arriving at the truth." United States v. McKeever, *supra,* 169 F.Supp. at 430, citing Monroe v. United States, *supra.* As with any other evidence, however, prior to its admission a proper foundation must be laid by counsel. The dispute in this case focuses upon whether such a foundation was laid for the admission of this recording.

In United States v. McKeever, *supra,* defendants were indicted for conspiracy to commit extortion. They attempted to introduce a tape recording for the purpose of impeaching a government witness, but the court disallowed admission of the tape on the ground of insufficient foundation. The court went on to state the requisite foundation necessary to the admission of a tape recording:

> "A review of the authorities leads to the conclusion that, before a sound recording is admitted into evidence, a foundation must be established by showing the following facts: (1) That the recording device was capable of taking the conversation now offered in evidence. (2) That the operator of the device was competent to operate the device. (3) That the recording is authentic and correct. (4) That changes, additions or deletions have not been made in the recording. (5) That the recording has been preserved in a manner that is shown to the court. (6) That the speakers are identified. (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement." *Id.* at 430 (citations omitted).

In Monroe v. United States, *supra,* another criminal case, the court held that sufficient foundation for the introduction of such testimony consisted of testimony (1) as to the operation of the recording device, (2) the method of operating it, (3) the accuracy of the recordings, and (4) the identities of the persons speaking. *Monroe* was subjected to examination and was discussed by the court in *McKeever,* and it appears

that they intimate two standards pertaining to proper foundation. Notwithstanding the apparent discrepancies or distinctions between the two, both are designed to demonstrate the accuracy of the recordings. Because neither the Nebraska courts nor this court has adopted either foundational standard, it is incumbent upon this court to examine them and determine which would be applicable. Each standard must be analyzed and they must be compared, to determine first, whether any substantial difference is discernible between them, and second, if not whether a proper foundation for the admission of the tape recording, according to the standards explicated did exist.

Although *McKeever* espoused seven standards, and *Monroe* only four, it is apparent that they constitute essentially the same inquiries. Each requires that the operation of the recording device must be identified, as well as the method of its operation. This includes, under *Monroe,* logically, the competency of the operator. Each requires that persons speaking be identified, and each requires that the recordings be accurate. *McKeever* sets forth three additional details, all of which demonstrate the accuracy of the recording itself, since if any of them were not met the recording could not be said to be accurate. Therefore, this court concludes that the standards set forth in *McKeever* and in *Monroe* relating to the proper foundation are essentially the same, although the *McKeever* standard is preferable in terms of explicitness, and is adopted as the guide in this case.

The question then becomes whether the foundation in this case met these standards. The defendant evidently concedes, and the court agrees, that most of the foundational requirements were met. The major dispute concerns the defendant's allegation that the recording was not shown to have been properly preserved.[7]

7. As pointed out earlier in this opinion, defendant also asserts that the au-

thenticity and correctness of the recording were not established, because Mr.

Defendant insists that the witness must establish a complete, uninterrupted possession of the tape in order to demonstrate that it was properly preserved.[8] However, upon examination of the standards set forth, all that is required is that a showing must be made to the court that the recording has been preserved, the obvious rationale being that such showing allows the inference that the recording is accurate.

Mr. Scoboda testified that the tapes had not been changed in any way, that the tape was exactly the same as it was when it was made, and that the only interruptions in his possession of it were due to instances in which the tape was played for prospective customers. Mr. Scoboda testified that the tape was used considerably for sales purposes in this manner. The court concludes that plaintiff has complied with the requirement "That the recording has been preserved in a manner that is shown to the court", that the manner of preservation shown does not lead to the conculsion that the recording has been altered or manipulated in any man-

ner, but on the contrary demonstrates its accuracy. No reason is apparent, nor is any suggested, why the tape would have been altered, or why it is not a true and accurate representation of what transpired at the meeting held in Scottsbluff in 1964. For this reason the court holds that the tape recording was admissible in evidence as proof of an admission, by CCEC, as to the right to obtain title to the equipment at the expiration of the lease by payment of one dollar.

## THE CONTRACT ITSELF

Although the court holds both the parol testimony and the tape recording admissible in evidence for their limited purpose of demonstrating that the purported "lease" was merely a subterfuge for a usurious loan transaction, further examination of the agreement itself demonstrates its true character, regardless of this other evidence. The rule has been succinctly explained as follows:

"[I]n determining the character of an instrument, the use of the term 'lease' has undoubted weight, but the governing consideration is the legal ef-

---

Scoboda replayed the tape in 1969 to refresh his memory of its contents, and because the alleged defect of uninterrupted custody carries over. Mr. Scoboda did state on direct examination that the tapes were authentic and accurate, and that he had listened to them prior to the trial of this case. It is not surprising that he had no independent recollection of precisely what was said at this meeting in light of the fact that it occurred some five years previously. But it is apparent that Mr. Scoboda did have some recollection as to its general nature and contents; otherwise he would have been unable to recall its existence, and would have probably been unable to procure it from among the fifty to sixty other tapes which he had in his possession. The court is satisfied that the testimony establishes the correctness of the recording; indeed, a contrary conclusion is not strongly pressed by defendant in its brief.

8. Defendant places considerable reliance upon criminal cases in urging this proposition. While not deciding the precise issue of differing standards, it is worth noting that a much stricter foundation would probably be followed in a criminal case, especially where the recording dealt with an alleged confession, than it would in a civil case such as the one at bar. Indeed, such conclusion can be gleaned from Solomon, Inc. v. Edgar, 92 Ga. App. 207, 88 S.E.2d 167 (1955). In that case suit was brought against a corporation and its employees for personal injuries and property damage suffered by plaintiff as a result of a collision between plaintiff's automobile and defendant's truck. A jury verdict was returned in plaintiff's favor and defendant moved for a new trial. The motion was denied and defendant appealed. At trial the court had excluded a dictaphone record of questions propounded by the corporation's counsel to one of its employees and his answers thereto, on the ground of improper foundation. On appeal the decision was affirmed. Although no in-depth analysis was made, the court did state that a proper foundation included the manner of preservation of the record, and intimated no conclusion that complete, uninterrupted possession of the tape was required.

fect of the instrument as gathered from all of its provisions." Burroughs Corp. v. Barry, 380 F.2d 427, 429 (8th Cir. 1967).

Examination of the "lease" readily discloses several factors pointing to the conclusion that in reality the agreement is one for a loan of money. All manufacturer warranties issued on each unit have been assigned to the User under the lease, regardless of whether they are expressed or implied. The User is not to sublease any units or interest in the lease, or any of User's rights under the lease except upon the consent of CCEC, nor may the User mortgage, pledge or otherwise encumber any units, or any of his interests therein, or permit the same to become encumbered.[9] All costs, expenses, fees, and charges incurred in connection with the use and operation of the units and all taxes in connection with them are to be paid by the User. Should CCEC be required to pay any such costs or expenses, it will be entitled to reimbursement from the User. All risk of loss or damage from whatever source, is assumed by User. Complete insurance coverage must be provided by the User, and CCEC is held harmless from any claims, demands, liabilities, losses, costs, and expenses related to the operation of such units. Extensive provisions are made in the event of default enabling CCEC to recover the full amount of the rent due under the contract, to hold the property free and clear of any rights of the User under the lease, and to retain all resale proceeds, refunds, and other sums, or to relet or sell any or all of the units. No mitigation is required and CCEC is entitled to *full* recovery of the face value of the "lease."

In sum, it is evident that all burdens of ownership are placed with plaintiff McKeeman, while CCEC, holding legal title to the units, stands ready to recover the full face amount of the purported lease. The units are large, permanent structures, affixed to plaintiff's land on concrete foundations extending approximately 3½ to 4 feet into the ground. They are not readily moveable in either a practical or economical sense. The land upon which these units are located is nowhere described as to its location. No recording was ever made of CCEC's ownership interest.

Many similar agreements, as pointed out by defendant, have been upheld. For example, in Sanders v. Commercial Credit Corporation, 398 F.2d 988 (5th Cir. 1968), the court held that the agreement was in fact a lease rather than an unperfected security agreement. In so holding, the court stated:

"[I]n a lease the lessee never owns the property. In the absence of a right or option in the lessee to acquire ownership of the leased property, the transaction is one of lease." *Id.* at 990.

In Western Contracting Corp. v. Commissioner, 271 F.2d 694 (8th Cir. 1959), the court held that an agreement, whereby Western would lease equipment from a dealer, and the dealer would procure a loan equal to the normal purchase price of the equipment from the bank, assigning a mortgage on the leased equipment as a mortgage, and in which Western would make payments directly to the bank, was a lease:

"It is perfectly clear that the lease agreements, standing alone, cannot be construed to be either sales agreements or contracts to sell. * * * The absence of either an option clause or a stipulation providing that upon payment of the stipulated rent title would vest in Western, is likewise fatal to a contention that the instruments upon their face have the characteristics of a conditional sales contract." *Id.* at 700.

■ Other examples could be subjected to analysis but to little avail for purposes of the instant case. In each case cited above the lease was upheld on the ground that there was an absence of

---

9. The court notes that this provision seems much more akin to any given financing arrangement than it does to a valid lease.

any clause bestowing upon the "lessee" an option to purchase the equipment. Under the terms of this lease, the court concludes that such an option, albeit not in express terms, does exist, and as such is fatal to the defendant's contention that the agreement is merely a lease.

Section twelve provides that in lieu of returning any unit to CCEC upon the expiration of the lease, User may arrange for the immediate sale of such unit and transmit the net resale proceeds delivered therefrom, subject to the provisions of Sections thirteen and fourteen. Nowhere in this section is the User excluded as a possible purchaser.

Section thirteen provides that at any time after the expiration of twelve months, User may terminate the lease, sell the units at a bona fide sale in the open market, and return the net amount received by the User from any such sale. Because nothing appears to prohibit a sale to User, no reason is indicated why the units could not be sold at a bona fide sale to User under this provision.

Section fourteen is a complex section which provides that CCEC shall refund to User the amount, if any, by which the sum of net resale proceeds (or insurance proceeds) and the total of all rental payments made to CCEC by User exceeds the total rent provided for in the lease, upon receipt of these net proceeds by CCEC. If the sum received by CCEC is less than the total rent called for in the lease, and if the lease is renewed or extended, then User must pay any deficiency to CCEC as additional rental. The net operational effect of Section fourteen is to allow the User to purchase the property and equipment for a nominal sum.

It is imperative to point out that there is no provision against the sale of the units and equipment to User, nor is there any indication that such sale would not be bona fide.[10] All that is provided for is that CCEC receive the full rental value of the lease. In light of these observations, notwithstanding those provisions set forth *supra* describing the contract as merely one of a "lease", it is evident that an option to purchase by User does exist under the agreement.[11] The written devise, as it purportedly exists in the form of a "lease", is merely a device designed to allow defendant to sidestep the effect of the usury laws. It is quite apparent that were this a loan, the rate of interest (10.25%) would be in excess of the statutory maximum.

Since the court is of the opinion that the contract entered into between the parties is not a lease, but in fact a loan at a usurious interest rate, it is necessary to discuss the Nebraska remedy. The most recent statement of the law in this respect was in Baker v. A. C. Nelson Co., 185 Neb. 128, 174 N.W.2d 197 (1970), where the court held that a finding that a contract is usurious does not make the contract void, but recovery is limited to the amount of the principal without interest, less any interest paid. Indeed, this is the remedy which is provided for by statute. See Neb.Rev.Stat. § 45–105 (Reissue 1968). Under this remedy, then, defendant would be limited to the amount of the principal under the original agreement, or $42,819.66 less the down payment.

10. In its brief defendant discounts the several hypotheticals offered by plaintiff demonstrating the operation of these sections, 12–14, on the ground that they do not represent bona fide transactions. Since there is no prohibition against the User purchasing the equipment, it seems distinctly apparent that such a sale would in fact be bona fide in nature. Additionally, in light of the testimony adduced at trial, it seems that this was the very essence of plaintiff's understanding of the lease.

11. Defendant would have the court hold that not only must an option to purchase exist for the User, but that option must be exclusive. Little support in the authorities is found for that conclusion, and the court concludes that an option to purchase under the lease which is exercisable in some manner is sufficient.

## COUNTERCLAIM OF CCEC

■ Disposition of this issue is controlled by the disposition of the issue of the true character of the lease. Since the court has concluded that the agreement is in fact a usurious loan, defendant CCEC is entitled only to recover the amount of the principal, or $9,414.90.

### Civil Number 03291

In the consolidated case, CCEC, as plaintiff, is attempting to recover from NFEC, as guarantor, $36,153.85 allegedly due from McKeeman on the purported lease. The guaranty was signed by Mr. Scoboda of NFEC guaranteeing McKeeman's performance. By attempting to enforce the guaranty, plaintiff raises two issues: (1) whether the guaranty is the result of fraudulent misrepresentations and hence unenforceable, and (2) assuming it is enforceable, what amount is plaintiff entitled to recover from NFEC. Additionally, should CCEC be entitled to recover from NFEC, the issue of whether NFEC is entitled to reimbursement from McKeeman must be decided.

At trial, Mr. Scoboda testified that he made several inquiries into the nature of the agreement, and stated repeatedly that he wanted to know whether the "lease" was a valid agreement and not in violation of the usury laws. He further testified that several representations were made by representatives of CCEC to the effect that the agreement was a valid lease and that nothing would happen. He also testified that it was upon that basis that he signed the guaranty.

The distinction is generally made between misrepresentations as to law and misrepresentations as to fact. A cause of action will lie for injury resulting from the latter but only in certain circumstances will a cause of action lie in the case of the former. Plaintiff contends that the statements made were merely statements of law, not of fact, and that since no relation of confidence and trust existed between it and NFEC, and since NFEC was an experienced dealer, no superior knowledge can be attributed to it. Defendant further asserts that the case does not fall within any of the exceptions to this rule.

The Nebraska rule pertaining to what constitutes fraud was succinctly stated in Peters v. Woodmen Accident & Life Co., 170 Neb. 861, 104 N.W.2d 490 (1960):

"[W]hat constitutes fraud is a matter of fact in each case. Deception finds expression in such a variety of ways that courts have studiously avoided reducing its elements to positive definitions. Courts content themselves with determining from the facts in each case whether fraud does or does not exist, for whatever satisfies the mind and conscience that fraud has or has not been practiced is sufficient." Id. at 870, 104 N.W.2d at 497 (citations omitted)

■ In some instances statements as to matters of law have been treated as misrepresentations of fact. From the authorities cited, the court concludes that in this case the statements that the agreement was in fact a valid lease constituted a representation of fact, although it may technically state a legal conclusion. The statement represents to the defendant that the document is, in fact, what it purports to be, and that fact was evidently so understood by defendant NFEC.

■ Thus the question becomes whether the element of scienter must be either alleged or in some way demonstrated before an allegation of fraud can be established. Plaintiff asserts that scienter is a necessary element, and that defendant has not proven such element. Defendant contends that under the Nebraska law no such element is required. Both rely upon Nebraska authorities. An examination of the more recent authorities, however, indicates that some element of knowledge is required as a basis for alleging fraudulent misrepresentation. The most recent declaration of this rule is found in Transportation

**950**

Equipment Rentals, Inc. v. Mauk, 184 Neb. 309, 167 N.W.2d 183 (1969):

"The essential elements required to sustain an action for fraud are, generally speaking, that a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; * * *" *Id.* at 312, 167 N.W.2d at 186.

*See also* Buhrman v. International Harvester Co., 181 Neb. 633, 150 N.W.2d 220 (1967); Nathan v. McKernan, 170 Neb. 1, 101 N.W.2d 756 (1960).

■ In light of these authorities, and in light of the statement made in Peters v. Woodmen Accident & Life Co., *supra*, the court concludes that there was no unconscionable conduct on the part of CCEC's representatives in making these statements as to the nature of the purported lease agreement inducing Mr. Scoboda to sign the guaranty. It is evident that Mr. Scoboda was well-versed in the needs of the farming community, and that he understood the arrangement being entered into, as well as the financing operations of CCEC. The representations that the agreement was a valid lease were made in good faith, were not known to be untrue, and were not made recklessly with the intent to deceive Mr. Scoboda.

Since the court is of the opinion that the guaranty was not entered into on the basis of fraudulent misrepresentations, it becomes necessary to determine the recovery to which plaintiff is entitled. Plaintiff, obviously, asserts it is entitled to the full value of the outstanding obligation. However, in light of the court's conclusion in Civil No. 03086 that the "lease" is in reality a usurious loan, the issue becomes whether NFEC as guarantor, will be allowed to take advantage of the existence of usury to the same extent as the debtor.

■ In Commonwealth Trailer Sales, Inc. v. Bradt, 166 Neb. 1, 87 N.W.2d 705 (1958), the rule as to who may avail themselves of the plea of usury, besides the debtor, was explained by the court:

"The rule embraces the heirs, legal representatives, and devisees of the borrower or debtor and *those who stand in the relation of sureties, guarantors,* or accommodation indorsers, with respect to the tainted obligation." *Id.* at 7, 87 N.W.2d at 709 (emphasis added).

See also 45 Am.Jur.2d, Interest and Usury, § 288 (1969); 91 C.J.S. Usury § 132(b) (1955). Since the contract between the debtor and CCEC is only vitiated to the extent of the usury, Neb.Rev. Stat. § 45–105 (Reissue 1968), it is clear that NFEC would similarly be able to avoid the guarantee to that extent.

■ It appears equally as clear that if NFEC is required to pay under its written guaranty, it is entitled to reimbursement from McKeeman, the third party defendant. The case of In Re Williams' Estate, 148 Neb. 208, 26 N.W. 2d 847 (1947) states that a guarantor may recover from the principal debtor under an implied promise in law, if there is not one in fact, when the guarantor enters into a contract of guaranty at the request of, or with the consent of the principal debtor. On payment of the debt, the guarantor has the immediate right of action against the principal debtor for reimbursement of the amount which he has paid. *Accord*, O. K. Door Co. v. Lincoln Engineering Construction Co., 174 Neb. 682, 119 N.W.2d 153 (1963); Highway Equipment & Supply Co. v. Jones, 182 Neb. 234, 153 N.W.2d 859 (1967); 38 C.J.S. Guaranty §§ 110, 111 (1943).

## CONCLUSION

For the reasons heretofore explained herein, the court concludes as follows:

1) The purported "lease" in this case is in fact merely a subterfuge for a usurious loan at the interest rate of 10.25% in violation of the usury laws of Nebraska, the face amount of said loan being $42,819.66 less the down payment.

2) The amount of $9,414.90 is still due and owing on the contract, and defendant CCEC is entitled to judgment in

its favor for that amount, under the provisions of the usury statutes of Nebraska.

3) The guaranty signed by Mr. Scoboda on behalf of NFEC was neither fraudulently induced, nor entered into on the basis of false or reckless statements made by representatives of CCEC.

4) NFEC is liable on the guaranty to the extent of the amount owing from the principal debtor, or $9,414.90.

5) NFEC is entitled to reimbursement from McKeeman, third party defendant in Civil No. 03291, in the amount which NFEC is required to pay, or $9,414.90.

A separate order consistent with the foregoing opinion will be entered by the court.