87 N.J. Super. 506 (1965)
210 A.2d 88
JOHN STEFFENAUER, PLAINTIFF,
v.
MYTELKA & ROSE, INC., D.M. & F.R., INC., A CORPORATION OF NEW JERSEY, AND B-W ACCEPTANCE CORPORATION, A CORPORATION OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided May 3, 1965.
*507 Mr. Cyril J. McCauley for plaintiff (Mr. Samuel J. Davidson, on the brief).
Mr. Ira A. Levy for defendants (Messrs. Gallanter & Levy, attorneys).
MATTHEWS, J.S.C.
In this action plaintiff seeks a determination that the transaction between the defendants and him, as described hereinafter, is usurious. His complaint demands discovery of the real nature of the transaction pursuant to N.J.S.A. 31:1-4, and he seeks to compel the defendant B-W Acceptance Corporation to accept payment of principal only, as provided in that statute.
The matter is presently before me on defendants' motion for summary judgment. At the time of argument plaintiff originally took the position that many questions of fact existed, thus precluding relief by way of summary judgment. When pressed for particulars as to factual issues, he conceded that a plenary hearing could produce no facts other than those set forth in his affidavit and answers to interrogatories. I am satisfied that no dispute as to material facts exists. Accordingly, for the purposes of this motion the statement of facts following, as taken from plaintiff's affidavits and answers to interrogatories, is accepted as true.
During May 1961 plaintiff became interested in the coinoperated dry cleaning business. He contacted defendant *508 Mytelka & Rose, Inc., which acts as the manufacturer's representative and distributor of machines for this type of operation. He was contacted at his home by Rickstein, a salesman for Mytelka & Rose. The two conferred at some length, and during the discussion Rickstein was acquainted by plaintiff with the details of the operation of the dry cleaning business. Rickstein explained that the machines necessary for the operation, plus related equipment, would cost approximately $18,750, and that this amount could be financed through Mytelka & Rose with defendant B-W Acceptance Corporation at an "interest" rate of 7% per year for four years on the balance of any unpaid purchase price. Plaintiff informed Rickstein that he thought the interest charge was quite high, but he states that he was told that a business loan was contemplated and that 7% "interest" was the standard rate at which a transaction of this nature was customarily financed. There followed several more discussions between plaintiff and Rickstein, following which plaintiff made a down-payment of $1,000 toward the purchase of the equipment necessary to commence operations on June 27, 1961. During the ensuing six months negotiations took place which produced some minor changes in the purchase plan and which decreased the price of the equipment required to $18,500. Following these latter negotiations, plaintiff decided to increase his down-payment on the equipment to $8,750, in order to cut down the high "interest" charges. This left a balance payable on the purchase of $9,750, plus 7% "interest" per year for four years, or $2,730, making a total amount due of $12,480 to be paid by plaintiff in 48 monthly installments of $260 each.
On April 13, 1962 plaintiff and defendant Mytelka & Rose entered into a conditional sales contract, and he simultaneously executed a note payable to the order of Mytelka & Rose, Inc., at B-W Acceptance Corporation, in the principal amount of $12,480 to be paid in 48 equal successive monthly installments of $260. The conditional sales contract contained the following legend:

*509
 "Cash Selling Price $18,500
 Less | A. Cash $ 8,750
 Down > B. Trade-in $
 Payment | C. Allowances $
 Unpaid Balance 9,750
 Add: Ins. Prems
 Add. Filing Fees
 Balance to be financed 9,750
 Add: Credit Service Charge 2,730
 Balance Payable in Installments 12,480"

Plaintiff now claims that the credit service charge of $2,730 was explained to him as being "interest" at the rate of 7% per annum for four years on the sum of $9,750, which was the "Balance to be financed." He states that at no time was the term "time price differential" used by Rickstein during negotiations and, he says, he does not know the meaning of that phrase.
On the same date the note and conditional sales contract were executed Mytelka & Rose assigned the papers to B-W Acceptance Corporation, for which Mytelka & Rose received $9,262.50. Although the forms of the note and contract which Mytelka & Rose used in the transaction were supplied by B-W Acceptance Corporation, it is not disputed that the two corporations are wholly separate and independent of each other. It is conceded that B-W Acceptance Corporation purchases notes and other evidences of indebtedness from Mytelka & Rose from time to time. Mytelka & Rose is a sales representative for Borg Warner, which manufactures the equipment in question. B-W Acceptance Corporation is affiliated with Borg Warner. Although the actual mechanics by which Mytelka & Rose arrived at the credit service charge have not been proven before me, it appears from the record that Mytelka & Rose and B-W Acceptance Corporation had previously agreed that B-W Acceptance Corporation would discount contracts and notes for Mytelka & Rose, based on a discount schedule which was the equivalent of 7% of the cash purchase price for each year that any obligation was to be outstanding.
*510 Defendants contend that the transaction in question is a bona fide sale of equipment by Mytelka & Rose to plaintiff; that the credit service charge is not interest but a time price differential, and that B-W Acceptance is the holder in due course of paper which arose out of a lawful transaction. Plaintiff contends that the "credit service charge" is nothing more than a cloak to cover a usurious transaction; that no credit price was ever actually stated or agreed upon, but rather that there was a mere balance stated to be due on a cash price, with interest on the unpaid balance in an amount exceeding the lawful rate of interest; further, that the relationship between Mytelka & Rose and B-W Acceptance Corporation is such that B-W Acceptance had notice of the usurious nature of the transaction, and therefore cannot be considered to be a holder in due course.
The primary issue here is whether the "credit service charge" stated in this conditional sales contract, which in effect represents the amount that the purchaser has agreed to pay for the privilege of paying the purchase price for the equipment in deferred installments, is interest for the loan or forbearance of money and, therefore, in contravention of our general usury statute, N.J.S.A. 31:1-1. Although this question has been litigated to a great extent in other jurisdictions, New Jersey has yet to pass directly upon the question.
The general rule of the majority of jurisdictions with respect to charges in transactions such as that under investigation here is stated in an annotation in 143 A.L.R. 238 (1943) as follows:
"It is well settled that where the contract of conditional sale is bona fide and the finance charge or other similar charge is included therein as a part of the total `time' or credit price of the chattel which the purchaser thereby agrees to pay upon a deferred payment basis, the finance charge does not constitute usury, even though such charge, if considered as interest, would be in excess of the highest lawful interest upon the cash purchase price for the time payment thereof is deferred under the contract, provided of course that the transaction was what it purported to be and not in fact a loan." (at p. 242) *511 A collection of the jurisdictions subscribing to the general rule may be found in 91 C.J.S. Usury § 18; 55 Am. Jur., Usury, § 23. The rule is subscribed to by our sister jurisdictions of New York, Pennsylvania, Delaware, District of Columbia, Connecticut and Rhode Island. See Levine v. Nolan Motors, 169 Misc. 1025, 8 N.Y.S.2d 311 (Sup. Ct. 1938), which specifically rejects the contrary view taken in Universal Credit Co. v. Lowell, 166 Misc. 15, 2 N.Y.S.2d 743 (City Ct. 1938); Failing v. National Bond and Investment Corp., 12 N.Y.S.2d 260 (Cty. Ct. 1938), reversing 168 Misc. 617, 6 N.Y.S.2d 67, affirmed 258 App. Div. 778, 14 N.Y.S.2d 1011 (App. Div. 1939); Equitable Credit & Discount Co. v. Geier, 342 Pa. 445, 21 A.2d 53 (Sup. Ct. 1941); Melnicoff v. Huber Investment Co., 12 Pa. D. & C. Rep. 405 (Mun. Ct. 1929); Langille v. Central-Penn. Nat. Bank of Philadelphia, 153 A.2d 211 (Del. Ch. 1959), affirmed 156 A.2d 410 (Del. Sup. Ct. 1959); Brooks v. Auto Wholesalers, Inc., 101 A.2d 255 (D.C. Mun. App. 1953); Zazzaro v. Colonial Acceptance Corp., 117 Conn. 251, 167 A. 734 (Sup. Ct. Err. 1933); Luchesi v. Capitol Loan & Finance Co., 83 R.I. 151, 113 A.2d 725 (Sup. Ct. 1955); and cf. Nazarian v. Lincoln Finance Corp., 77 R.I. 497, 78 A.2d 7 (Sup. Ct. 1951).
Courts adopting the majority view usually exclude transactions of this nature from the ambit of the general usury statutes because of the real nature of the transaction involved. A good expression of a general approach is found in General Motors Acceptance Corp. v. Weinrich, 218 Mo. App. 68, 262 S.W. 425 (App. Ct. 1924), where it was stated:
"A loan may be cloaked in the outward form and appearance of a purchase, in which case that will not change the substance of the transaction or hide the usury. But if there is a real and bona fide purchase, not made as the occasion or pretext for a loan, the transaction will not be usurious even though the sale be for an exorbitant price, and a note is taken, at legal rates, for the unpaid purchase money. The reason is that the statute against usury is striking at and forbidding the exaction or receipt of more than a specified legal rate for the hire of money and not of anything else; and a purchaser is not like the needy borrower, a victim of a rapacious lender, since he can *512 refrain from the purchase if he does not choose to pay the price asked by the seller. So that a sale in good faith of property, merchandise, or of an indorsement, or guaranty, or even of credit, if the seller has no other interest in the transaction, is valid and not open to the objection of usury whatever the price."
See Dunn v. Midland Loan & Finance Corp., 206 Minn. 550, 289 N.W. 411 (Sup. Ct. 1939); Berger, "Usury in Installment Sales," 2 Law & Contemp. Probs. 148 (1935). In placing the installment sale by way of deferred instrument and chattel security within the category of approved sale by way of a credit price, the majority view seems to establish two criteria which have to be met. First, that the facts reveal an intent between the parties to the transaction to consummate an actual purchase and sale. Second, that the purchaser be fully aware of what he is doing, and that he have an opportunity to make an intelligent choice of buying a chattel for less now rather than more later. See e.g., Commercial Credit Co. v. Tarwater, 215 Ala. 123, 110 So. 39, 48 A.L.R. 1437 (Sup. Ct. 1926); Grand Island Finance Company v. Fowler, 124 Neb. 514, 247 N.W. 429 (Sup. Ct. 1933); Lamb v. Ed Maher, Inc., 368 S.W.2d 255 (Tex. Civ. App. 1963); McNish v. General Credit Corp., 164 Neb. 526, 83 N.W.2d 1 (Sup. Ct. 1957); Hare v. General Contract Purchase Corp., 220 Ark. 601, 249 S.W.2d 973 (Sup. Ct. 1962). In recent years courts in many jurisdictions have looked more closely at transactions of this type to ascertain the true nature of the transaction between the parties involved. See, generally, Note, "Judicial and Legislative Treatment of `Usurious' Credit Sales," 71 Harv. L. Rev. 1143 (1958); Raffel, "Conditional Sales Contracts and Usury Laws," 76 Banking L.J. 829 (1959).
The view of what might be termed minority jurisdictions with respect to these transactions is best exemplified by the courts of Nebraska and Arkansas. Nebraska originally had adopted the position that a bona fide sale on credit terms for a price in excess of the cash price was not violative of its general usury law. Nebraska included in such transactions a *513 sale by way of deferred instruments and chattel security. Grand Island Finance Company v. Fowler, supra. After a number of decisions which seemed to express doubt in the wisdom of the majority rule, see e.g., General Motors Acceptance Corp. v. Mackrill, 175 Neb. 631, 122 N.W.2d 742 (1963), the Supreme Court of Nebraska, in Lloyd v. Gutgsell, 175 Neb. 775, 124 N.W.2d 198 (1963), made an express break with the past, holding that transactions of the type with which we are here concerned could not honestly be said to be good faith time sales. In essence, the court found that the time price differential or credit service charge, whatever called, was asserted for the forbearance to collect the full cash price, and therefore for the use of money; further, that such a charge, regardless of its label, constituted interest.
Arkansas has also adopted the view that installment sales of this type are not really sales, but are loans to the purchaser made either by the seller or the person to whom the seller has discounted the deferred instruments and the security agreement. See Hare v. General Contract Purchase Corp., supra, and Sloan v. Sears, Roebuck & Co., 228 Ark. 464, 308 S.W.2d 802 (Sup. Ct. 1958). The approach of the Arkansas Supreme Court in this area is similar to that adopted by Nebraska.
The common law in our State is silent as to the question before me. There have been, however, some expressions of legislative policy with respect to similar transactions in statutes enacted over the years. Thus, under N.J.S.A. 17:9A-53 to 59 (L. 1948, c. 67, as amended) banks have been permitted to make installment loans, under certain defined circumstances, at rates in excess of 6%. Under recent legislation, banks have been permitted to make small business loans, payable in installments, again under defined circumstances, at rates in excess of 6%. See N.J.S.A. 17:9A-59.25 to 59.39 (L. 1964, c. 162).
Since 1948 the Legislature has addressed itself to problems created by retail sales where the seller charges an amount in excess of the cash price of goods for the privilege of purchasing *514 the goods on an installment basis. Of interest is L. 1948, c. 419 (N.J.S.A. 17:16B-1 to 12), which has since been repealed. Chapter 419 was designed to place some controls on the conduct of sales finance companies which bought installment paper from retail sellers, or which advanced money to the retail seller, taking the paper as security for the loan or advance. Under this legislation some indirect control was placed over the conduct of the retail seller. The act covered sales of "all chattels personal having a cash price of * * * $3,000.00 or less, but not including money or things in action." N.J.S.A. 17:16B-1. "Retail installment contract" was defined as "any contract * * * evidencing an agreement to pay the retail purchase price of goods, * * * in installments over a period of time and pursuant to which title to or a lien upon the goods is retained or taken by the retail seller as security for the payment of the amount of said retail installment contract * * *." N.J.S.A. 17:16B-1(b). "Cash price" and "time price differential" were also defined. N.J.S.A. 17:16B-1(f) and (g). All persons engaging in the business of a sales finance company, as defined in N.J.S.A. 17:16B-1(e), were required to be licensed. N.J.S.A. 17:16B-2. Grounds for suspension or revocation of the license were established. N.J.S.A. 17:16B-3. Retail buyers were granted the privilege of filing complaints with the Commissioner of Banking and Insurance, who was invested with certain investigating powers. N.J.S.A. 17:16B-4 and 5. The provisions to be contained in a retail installment contract were enumerated in N.J.S.A. 17:16B-6. Under N.J.S.A. 17:16B-6(b)(5) it was permissible for a time price differential to be exacted, but the statute established no limit on the amount of the same. Under N.J.S.A. 17:16B-7 a retail buyer was permitted to pay in full before maturity and obtain a refund credit. Finally, a limited extra charge was permitted on the renewal, or extension, or refund of a transaction under N.J.S.A. 17:16B-8.
L. 1948, c. 419 was repealed by L. 1960, c. 40, which is compiled as N.J.S.A. 17:16C-1 to 61. The 1960 legislation *515 made two essential changes in the 1948 law with respect to the questions here before the court. Chapter 40 covers the sale of automobiles, N.J.S.A. 17:16C-1(g) and (h), and the sale of "all chattels personal having a cash price of $7,500.00 or less, but not including * * * goods sold for commercial or business use." (Emphasis added) Under the provisions of N.J.S.A. 17:16C-40:
"No retail seller, sales finance company or holder shall make any loan of money or advance of credit to a retail buyer on or in connection with any retail installment contract and charge, contract for or receive thereon a greater rate of interest than he would otherwise be permitted by law to charge except in accordance with the provisions of this act; * * *."
The act more specifically defines "time price differential" (N.J.S.A. 17:16C-1 (l) and the maximum rate of the differential which may be applied to different classifications of goods. N.J.S.A. 17:16C-41. On all goods covered by the act, except motor vehicles, the time price differential may not exceed a rate of 10% on the principal balance owed, which is defined to be the sum of (a) the difference between the cash price and the down-payment, (b) the amount included for insurance, and (c) the amount of official fees. The provisions of N.J.S.A. 17:16C-27 established that these separate items be set forth in a retail installment contract.
A study of the recent legislation (L. 1960, c. 40) indicates the intent of the Legislature to place definite standards on the conduct of retail installment sellers and the persons with whom they finance their paper. Specifically excluded from the terms of the regulatory legislation are sales where the purchase price exceeds $7,500, and sales of goods for commercial or business use.
Considering the contentions advanced here by plaintiff, a resolution of the question presented must be reached in light of our State's established policy to permit, in basically consumer purchases, a rate of return on installment sales in excess of that permitted by the general usury statute. Chapter *516 40 seems to codify the existing commercial custom and usage which prevails in transactions of this type. See Adelson, "The Mechanics of the Installment Credit Sale," 2 Law and Contemp. Probs. 218 (1935). The legislation is obviously designed to protect the consumer from predatory sellers and financers.
The contract which is the subject matter of this action, while involving a sale of goods for commercial or business use and therefore not controlled thereby, is in substantial compliance with the requirements of L. 1960, c. 40. The credit service charge, or time price differential, or as it is characterized by plaintiff, the interest, is below the maximum 10% rate established in N.J.S.A. 17:16C-41. It seems reasonable to infer that the Legislature, when it addressed itself to the problem of installment sales, was concerned only with protecting, and therefore regulating, the average consumer in the purchase of goods which in our present day society are considered necessaries. The commercial entrepreneur was left to deal at arm's length with the seller and financer.
Plaintiff urges the adoption of the minority view in this jurisdiction. Even under the minority view, at least one jurisdiction which has an installment loan statute has struck down transactions not covered by that law where the finance charge was in excess of the rate of interest permitted by statute. See Powell v. Edwards, 162 Neb. 11, 75 N.W.2d 122 (Sup. Ct. 1956).
Under the undisputed facts here, there is no question but that there was a bona fide purchase and sale of the coin-operated dry cleaning equipment. All formalities were observed in the transaction in that there were two separate and distinct activities, i.e., the sale and the negotiation of the note and security paper. As noted, the credit service charge is established at 7%, which is a rate well within the maximum permitted by the Retail Installment Sales Act of 1960. In Langille v. Central-Penn. Nat. Bank of Philadelphia, supra, Chancellor Seitz, in the opinion below, points out that the prohibition against usury has been to protect those who are *517 forced by adversity to borrow and/or to obtain extensions of time for payment of obligations already incurred. It is not usual that a person who purchases goods, especially those to be used in a commercial or business venture, purchases them because of adverse circumstances, such as is the case of one seeking to borrow money or attempting to obtain an extension of time for the repayment of a loan. It seems to me to be implicit, considering the activities of our Legislature in this area, that the public policy of our State is such as to permit bona fide sales on time and credit for which more than the legal rate of 6% is exacted as a credit service charge or time price differential. To hold otherwise, it is submitted, would be to ignore the facts of everyday commercial life. Concededly, the issue involved seems to bring about an exercise in semantics. This observation, I believe, is best answered by the words of Chancellor Seitz in Langille v. Central-Penn. Nat. Bank of Philadelphia, supra:
"Every credit transaction partakes of a loan, a loan by the seller to the buyer. Therefore, it is impossible to distinguish `loan' from credit per se. Where violation of a usury statute is alleged, semantics must give way to substance; and the question must always be whether the transaction in question was the kind of transaction which it was the intention of the legislature to prevent, i.e., was the `loan' a loan within the meaning to [sic] the statute. See Dunn v. Midland Loan Finance Corp., 206 Minn. 550, 289 N.W. 411. Frequently, the issue is formulated in terms of `credit' versus `cash' sale. Compare Commercial Credit Co. v. Tarwater, 215 Ala. 123, 110 So. 39, 48 A.L.R. [1437] 1442. In either case the real issue is the same." (153 A.2d, at p. 213)
For the above reasons, defendants' motions for summary judgment are granted, without costs.