Joseph L. McGALLIARD and Mickey L.
McGalliard, d/b/a Import Palace,
Appellants,

v.

LIBERTY LEASING COMPANY OF
ALASKA, INC., an Alaska Cor-
poration, Appellee.

No. 2003.

Supreme Court of Alaska.

April 3, 1975.

Edward W. Tucker, Anchorage, for ap-
pellants.

James L. Johnston, Anchorage, for ap-
pellee.

OPINION

Before RABINOWITZ, C. J., and ER-
WIN, BOOCHEVER, and FITZGER-
ALD, JJ.

FITZGERALD, Justice.

In this opinion we decide that a third-party loan cloaked in the form of a lease is within the purview of the usury laws, AS 45.45.010 et seq.[1] We hold that the transaction in the instant case was usurious.

During the summer of 1968 Joseph and Mickey McGalliard, d/b/a Import Palace, entered discussions with Robert Ryland[2] concerning relocation of their gift and novelty store. To make relocation of the store feasible, the McGalliards needed to finance the acquisition of trade fixtures. The financing was eventually arranged by Western Fixtures through Liberty Leasing Company of Alaska.

Following the negotiations, Liberty Leasing, Inc. paid the total price of the trade fixtures, amounting, to $17,836.88, to Western. The fixtures were delivered directly by Western to the McGalliards at the new location. To complete the transaction, the McGalliards then entered into a "lease" arrangement with Liberty. The written instrument called for 36 monthly payments of $686.72 for a total of $24,721.92. It further provided for annual extensions thereafter in consideration of yearly payments of $1,783.68.

The McGalliards paid in $13,047.68 under the terms of the agreement and then defaulted in making further payments. Liberty brought suit in the superior court to recover the balance of payments due under the lease and demanded judgment for the value of the trade fixtures. The McGalliards answered setting up numerous defenses and counterclaims, only one of which has any significance in this appeal. The McGalliards claim that the "lease" was in substance a loan or forbearance of money at a usurious rate of interest in violation of AS 45.45.010 et seq.

The trial judge was uncertain in his characterization of the transaction. Although he concluded that the three-party arrangement was an integrated transaction with Liberty in the position of a financier, he also spoke of the Liberty/McGalliard transaction as a conditional sale. Because he saw the Liberty/McGalliard transaction as a conditional sale, the trial judge felt compelled to honor, as he characterized it, a longstanding legal fiction holding conditional sales outside the reach of the usury statutes. Judgment was entered for Liberty in the amount of $11,674.24, the remaining payments due under the agreement. The trade fixtures were ordered sold and the proceeds applied to the amount due with any excess awarded to the McGalliards. The McGalliards now appeal from the judgment.

In its efforts to determine whether a purported lease or sale arrangement involves a usurious loan, the trial court must look to the essential relationship of the parties and the substance of the transaction, rather than to one isolated aspect of the transaction. We have noted

1. At the time of the transaction AS 45.45.010 provided:

    *Legal rate of interest.* (a) The rate of interest in the state is six per cent a year and no more on (1) money after it is due; (2) judgments and decrees for the payment of money, except that a judgment or decree founded on a contract in writing providing for the payment of interest until paid at a specified rate exceeding six per cent a year and not exceeding 10 per cent a year bears interest at the rate specified in the contract if the interest rate is set out in the judgment or decree; (3) money received to the use of another and retained beyond a reasonable time without the owner's express or implied consent; (4) money due upon the settlement of matured accounts from the day the balance is ascertained; or (5) money

due or to become due where there is a contract to pay interest and no rate is specified.

    (b) Interest at the rate of eight per cent may be charged by express agreement of the parties in a contract.

AS 45.45.020 provided then as it does now:

    *Higher rate of interest prohibited.* No person may, directly or indirectly, receive in money, goods, or things in action, or in any other manner, a greater sum or value for the loan or use of money, or upon contract founded upon a bargain, sale, or loan of wares, merchandise, goods, chattels, lands, and tenements, than is prescribed in §§ 10–70 of this chapter.

2. The McGalliards had previously purchased trade fixtures from Ryland.

that on other occasions courts have looked through the form of a transaction to its substance. In Metcalf v. Bartrand, 491 P.2d 747 (Alaska 1971), we held a repurchase contract to be nothing more than a cloak for a usurious loan. Other courts have found usurious loans in contracts of sale as well as in contracts where the primary purpose is to lend money.[3] In determining whether a purported lease or sale arrangement involves a usurious loan, several indicia are frequently relied on by the courts. These include, but are not limited to, the following: (1) intention of any of the parties to create a loan or extension of credit;[4] (2) discussion between the vendor and vendee of financing possibilities or efforts by the vendee to seek financing elsewhere;[5] (3) existence of a close relationship between a vendor and a financier;[6] (4) proof of a normal business practice to assign paper shortly after a transaction is consummated;[7] (5) relation of the price the vendor receives for his paper and his cash selling price;[8] and (6) computation of the excess (time-price) charges in a manner in which loan interest is usually computed.[9]

The Supreme Court of Washington in National Bank of Commerce v. Thomsen, 80 Wash.2d 406, 495 P.2d 332 (1972), held the "time price differential" in the purchase of an automobile to be usurious interest on a loan. In reversing the trial court's holding that the transaction was a bona fide conditional sale, the Washington Supreme Court posed the following question:

When a purchase is financed by a third party, is the relationship between the purchaser and the financier that of vendee and vendor or that of borrower and lender?

We think the answer is obvious when the question is stated. The party who furnished the money with which the purchase is made and to whom the purchaser obligates himself to repay that money is a lender. It follows that the charge which is made for that loan is interest . . . .. *Id.* at 337.

In McKeeman v. Commercial Credit Equipment Corp., 320 F.Supp. 938 (D.Neb. 1970), the court found that a purported lease was in fact a usurious loan. McKeeman purchased silos and other farm equipment from Norfolk Farm Equipment Co. (NFEC) for which he received a statement for the full purchase price of $42,819.66. After the equipment was delivered, NFEC sent Commercial Credit Equipment Corp. (CCEC) a statement for the same amount. CCEC paid the statement and entered a "lease" agreement with McKeeman for the equipment in the amount of $58,188.06. The lease assigned all manufacturer's warranties to the user, required the user to pay all taxes, insurance and costs, and placed all risk of loss on the user. The court found that the lease included a purchase option of one dollar. The court concluded that the lease form was merely a device to avoid application of

---

3. *See* Daniel v. First Nat'l Bank, 227 F.2d 353 (5th Cir. 1955); Lloyd v. Gutgsell, 175 Neb. 775, 124 N.W.2d 198 (1963); Annot., 14 A.L.R.3d 1065 (1967). *Contra,* Steffenauer v. Mytelka & Rose, Inc., 87 N.J.Super. 506, 210 A.2d 88 (1965).

4. *Cf.* Burr v. Capital Reserve Corp., 71 Cal. 2d 983, 80 Cal.Rptr. 345, 458 P.2d 185 (1969).

5. *See* C.I.T. Corp. v. Edwards, 418 P.2d 685, 688 (Okl.1966).

6. The relationship can be evidenced by use of a finance company's forms, by proof of an agency relationship, by contemporaneous assignments, and in various other ways. *See* Daniel v. First Nat'l Bank, 227 F.2d 353, 356 (5th Cir. 1955). *See also* Warren, Regulation of Finance Charges in Retail Instalment Sales, 68 Yale L.J. 839 (1959).

7. *See* Warren, *supra* note 6, at 843.

8. *See* National Bank of Commerce v. Thomsen, 80 Wash.2d 406, 495 P.2d 332, 338 (1972).

9. *See* Daniel v. First Nat'l Bank, 227 F.2d 353, 356 (5th Cir. 1955); Lloyd v. Gutgsell, 175 Neb. 775, 124 N.W.2d 198, 204 (1963).

the penalties of the usury law on a usurious loan. 320 F.Supp. at 948. The situation in *McKeeman* is strikingly similar to that in the instant case.[10]

Applying the foregoing principles to the case at bar, we find the conclusions of the trial judge inconsistent. We agree that the three-party transaction was integrated and that the Liberty/McGalliard arrangement was a loan. We cannot agree that the Liberty/McGalliard "lease" can be characterized as a conditional sale and that the interest component in the "lease" was a time-price differential.

The McGalliards purchased the trade fixtures from the supplier, Western. Financing was provided by Liberty, which secured the loan to the McGalliards by purportedly taking title from Western and making a "lease" with the McGalliards. Ryland testified that after the McGalliards had selected the equipment, they were given the choice of paying for the fixtures in cash, borrowing the amount of the purchase price, or arranging the transaction through a leasing company. Mrs. McGalliard testified that the three options offered by Western were cash payment, bank loan, or "they [Western Fixtures] could handle it for us." Mr. McGalliard's testimony was substantially the same as Mrs. McGalliard's testimony. Both of the McGalliards testified that they agreed to rely on Western Fixtures to arrange financing. The transaction in this case evidences no motivation to use a lease form for tax considerations or other accounting considerations frequently moving sophisticated businessmen to employ lease rather than sale forms.

Liberty's president, Sparks, was clear in his trial testimony that his company's sole involvement in the McGalliard transaction and in equipment transactions generally is advancing cash to a lessee. He testified that once a lease is signed, the lessee is free to buy wherever and whatever it wants. The nature of Liberty's business is summed up in Sparks' statement that, "it's certainly advancing in the line of credit of the leasing company." It is of some importance to note that Liberty is not engaged in the retail sales business. Liberty has no showroom, no inventory, no catalogs, no salesmen, nor does it advertise the sale or lease of commercial fixtures. Rather, testimony adduced at trial shows that Liberty from time to time enters financing arrangements characteristic of commercial loans with retailers such as Western Fixtures, with whom Liberty had a close working relationship.

Liberty's sole concern in the McGalliard transaction was financing. The fixtures were considered in one lump sum with no differentiation between costs and continued value of individual fixtures. The only contact between Liberty and the "McGalliards was the sending" and receipt of monthly payments. All complaints and servicing were directed to and provided by the supplier, Western Fixtures. During the lease term the lessee was required to pay for insurance, taxes, and repairs and to bear the risk of loss from theft or damage.[11]

It is urged by appellee that analysis of the lease terms under the provisions of the Uniform Commercial Code, especially AS 45.05.020(37), requires reversal of the trial judge.[12] Under the statute, however, it is

10. Appellee's reliance on Burr v. Capital Reserve Corp., 71 Cal.2d 983, 80 Cal.Rptr. 345, 458 P.2d 185 (1969), is misplaced since the trial court in *Burr* found that the transaction was not a loan.

11. *See* Davis Brothers v. Misco Leasing, Inc., 508 S.W.2d 908, 913 (Tex.Ct.Civ.App.1974).

12. AS 45.05.020(37) provides in pertinent part:

"security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation . . . whether a lease is intended as security is to be determined by the facts of each case; however, (A) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (B) an agreement that upon compliance with the terms of the lease the lessee

clear that the question whether a lease is intended as security is to be determined by the facts of each case. The existence of an option in a lease is recognized by the statute as a factor to consider in determining the true nature of a lease. However, the use of an option clause in no way precludes consideration of the other indicia and factors we have noted.

Nor does consideration of the option in the Liberty/McGalliard lease under the Uniform Commercial Code change the result. The "lease" before the court does not contain an express option to purchase. The trial judge found, however, that the renewal option in the lease was in fact a purchase option. He characterized the option as minimal, allowing the purchaser to pick "the thing up" for "a certain little balloon payment."

It is true there is some dispute in the testimony as to what was intended concerning renewal and the options under the lease. According to the McGalliards' testimony, Ryland told them that the lease was a mere formality and that the property would become theirs upon completion of the lease term. Ryland denied that he told the McGalliards the property would become theirs upon termination of the lease. Nevertheless, both Ryland and Robert J. Sparks, the owner of Liberty Leasing Company, testified that the leasing company was not interested in reacquiring the equipment at the end of the 36 month term. Sparks admitted as well that it was the usual practice of Liberty Leasing to abandon leased items to the lessee after the first annual renewal payment following the original term. Liberty neither expected nor desired return of the leased fixtures at the end of the lease.

The Supreme Court of Oregon in Peco, Inc. v. Hartbauer Tool & Die Co., 262 Or. 573, 500 P.2d 708 (1972), recognized three alternative tests for determining if a purchase option is "nominal" within the meaning of the Uniform Commercial Code. Two have particular relevance to the McGalliard/Liberty "leasing" transaction. The first is an "economic compulsion" test, i. e., would completion of the purchase be the only sensible course open to the lessee. The second involves a comparison of the option price with the original purchase price.[13]

According to the evidence, at the end of the lease term the McGalliards would have paid almost $7,000 in excess of the original value of the fixtures.[14] At that time the value of the fixtures to the McGalliards would have been significantly greater than the salvage value. Under such circumstances it would be unreasonable to expect a businessman to return the fixtures and commence a new acquisition scheme. See In re Oak Manufacturing, 6 U.C.C.Rep. Serv. 1273, 1277 (S.D.N.Y.1969) (rental payments of $1,309.08, $114.80 in excess of purchase price of $1,195.00); In re Vaillancourt, 7 U.C.C.Rep.Serv. 748, 762 (D. Me.1970) (choice of paying $147.25 to become the owner or $204.80 to lease for another year held no choice at all).

A comparison of the option price with the original purchase price leads to a similar conclusion. Several courts have focussed on 10% as an indicator of nominality of option price. In re Herold Radio & Electronics Corp., 218 F.Supp. 284 (S.

---

shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security . . . . .

The record clearly indicates that the trial judge considered the U.C.C. standard. The transcript of proceedings on November 14, 1972, records Judge Singleton stating, "Very well, I think that the court has reviewed the Uniform Commercial Code, particularly the definition of the security . . . . . " The judge then proceeded to paraphrase the relevant section of AS 45.05.020(37).

13. The third alternative test for determining whether an option price is nominal is comparison of the option price with the value of the property at the time for exercising the option. 500 P.2d at 710. See also In re Oak Manufacturing, 6 U.C.C.Rep.Serv. 1273, 1276 (S.D.N.Y.1969).

14. We calculate this to be approximately 138% of the original value of the fixtures.

D.N.Y.1963), aff'd, 327 F.2d 564 (2d Cir. 1964) ; In re Oak Manufacturing, 6 U.C. C.Rep.Serv. 1273 (S.D.N.Y.1969) ; *cf.* In re Alpha Creamery Co., Inc., 4 U.C.C.Rep. Serv. 794 (W.D.Mich.1967) (25%). The option in the McGalliard/Liberty transaction was 10% of the original purchase price and approximately 7.2% of the total rentals under the lease. The option thus appears to be minimal. The purported lease is not a true lease but is in fact an installment loan.[15]

In State ex rel. Turner v. Younker Bros., Inc., 210 N.W.2d 550, 559 (Iowa 1973), the Iowa Supreme Court pointed out that Alaska, Iowa, and the Virgin Islands are the only U. S. jurisdictions in which the usury laws include the word "sale". AS 45.45.020. The Alaska statute was apparently adopted from the pre-1900 Oregon code. Oregon subsequently amended its usury laws and removed sales from their purview. The Alaska legislature has not so amended the Alaska statutes. Because we conclude that the Liberty/McGalliard transaction was a third-party loan, it is not necessary to consider the applicability of the Alaska usury statutes to commercial or retail sales. Appellee's policy arguments concerning the importance of commercial leases would more appropriately be addressed to the legislature.

The trial testimony discloses that the rate of interest charged by Liberty was between 12.8% (appellee's testimony) and 25.5% (appellants' testimony). Regardless of the figure used, it is clear that a usurious rate of interest was charged. AS 45.45.010 et seq. AS 45.45.030 provides that when usurious interest has been received or collected the person paying it may recover from the person receiving the payment double the amount of interest collected.[16] As early as 1907 the Alaska courts acknowledged that the statute permits a debtor to recover under this provision only when he has paid a sum greater that the principal plus lawful interest.[17] Since the total sum paid to Liberty by the McGalliards does not exceed the principal borrowed plus lawful interest, the requirements for recovery under AS 45.45.030 have not been met in this case. AS 45.45.-040 contains no such limitation. Under AS 45.45.040 the entire interest is forfeited and the court shall give judgment for the plaintiff for the amount due, without interest, and in favor of the defendants for costs of the action.[18]

15. This is not a case involving a two-party credit sale or a retail charge account plan. While some jurisdictions have found a loan component in two-party transactions, we do not reach that issue in this case.

*See* State ex rel. Turner v. Younker Bros., Inc., 210 N.W.2d 550 (Iowa 1973) ; State v. J. C. Penney Co., 48 Wis.2d 125, 179 N.W. 2d 641 (1970). For a discussion of potential problems with extension of the usury laws to retail credit sales see Note, Interest Incognito —Usury Statute Applied to Revolving Charge Account Agreement, 34 U.Pitt.L.Rev. 54, 62 (1972).

16. AS 45.45.030 provides :

*Action for recovery of double amount of usurious interest paid.* If interest greater than that prescribed in §§ 10 and 20 of this chapter is received or. collected, the person paying it may, by action brought within two years after the payment, recover from the person receiving the payment double the amount of the interest received or collected.

17. *See* Werner v. Lorentzen, 3 Alaska 275 (Alaska 1907). *Cf.* Sparkman & McLean Income Fund v. Wald, 10 Wash.App. 765, 520 P.2d 173, 175 (Ct.App.1974).

18. AS 45.45.040 provides :

*Usurious rate as working forfeiture of entire interest.* If in an action brought on a contract, the court determines that a rate of interest has been contracted for greater than is authorized by §§ 10–70 of this chapter, either directly or indirectly, in money, property, or other valuable thing, or that a gift or donation of money, property, or other valuable thing has been made or promised to be made to a lender or creditor, or to a person for him, directly or indirectly, by the borrower or debtor, or a person for him, the design of which is to obtain for money so loaned, or for debts due or to become due, a rate of interest greater than that specified by §§ 10–70 of this chapter, the rate of interest is usurious and works a forfeiture of the entire interest on the debt. The court shall give judgment for the

We vacate the judgment of the trial court and remand with instructions to re-compute the amount of the judgment consistent with AS 45.45.040 and this opinion.[19]

BOOCHEVER, Justice (dissenting).

Although I can agree with a great deal of the majority opinion, I dissent for the reason that I believe the case should be remanded to the trial court for a determination of factual issues as to whether the lease is subject to the usury law. I also would place a different emphasis on some of the considerations set forth by the majority in determining those issues.

This case presents a difficult question concerning the applicability of Alaska's usury statute, AS 45.45.010 et seq. to a relatively modern commercial leasing agreement. The fundamental question here is whether the agreement between Liberty Leasing and the defendants was, in fact, a bona fide lease. If the transaction was truly a lease of personal property, then the statutory prohibitions barring the imposition of usurious interest rates on loans or on credit transactions involving the sale of property would not apply.

The trial judge in this case specifically found that the agreement was in substance a conditional sale contract written in the form of a lease. However, the trial judge felt that as a conditional sale contract, it was outside the purview of the usury statute. In so concluding, the trial judge was invoking the time-price doctrine which is a judicially-created exception to the usury statutes adopted by a majority of United States' jurisdictions.[1]

The doctrine is an outgrowth of judicial hostility to the usury statutes stemming from the increasing recognition among both scholars and respected members of the business and legal communities of the need for a more flexible credit structure to sustain a twentieth century economy. The doctrine purports to make a distinction between lendor credit and vendor credit. A charge imposed for the loan or forbearance of money is called interest. A charge imposed for extending credit in a transaction involving the sale of goods is called a time-price differential. As the trial judge below noted, these are functionally identical credit transactions. Nevertheless, the doctrine would except the latter from the limitations of the usury statute. Thus, the doctrine rests on an analytical basis which is essentially fictitious,[2] but, in the absence of appropriate legislative action, it has proven a highly useful legal fiction and has thus flourished.

amount due, without interest, on the sum loaned or the debt contracted, against the defendant and in favor of the plaintiff and against the plaintiff for costs of action, whether the action is contested or not.

19. We are in agreement with much of the dissenting opinion's discussion of the difficulties in distinguishing leases from conditional sales under AS 45.05.020(37). But while our dissenting colleague would remand to the superior court, in light of the appropriate legal standard, for a finding of whether the purchase option was for a "nominal" amount, as we have previously noted we are of the opinion that the record discloses the trial court applied the correct standard and found that the option was for a "nominal" consideration. Since the superior court's findings are not clearly erroneous, a remand would be improper.

1. United States v. Commercial Credit Corp., 242 F.2d 57 (5th Cir. 1957) ; Petersen v. Philco Finance Corp., 91 Idaho 644, 428 P.2d 961 (1967) ; Steffenauer v. Mytelka & Rose, Inc., 81 N.J.Super. 506, 210 A.2d 88 (1956) ; Henry v. P. & E. Finance Co., 197 Okl. 676, 174 P.2d 373 (1946) ; John Deere Indus. Equipment Co., Inc. v. Delphia, 266 Or. 116, 511 P.2d 386 (1973) ; Mathis v. Hollard Furnace Co., 166 P.2d 518 (Utah 1946) ; Hafer v. Spaeth, 22 Wash.2d 378, 156 P.2d 408 (1945).

2. It is this analytically unsound distinction between interest and a time price differential which has led some courts to limit the scope of the time-price doctrine and apply the usury statutes to theretofore protected "sales". See Hare v. General Contract Purchase Corp., 220 Ark. 601, 249 S.W.2d 973 (1952) ; Sloan v. Sears, Roebuck & Co., 228 Ark. 464, 308 S.W.2d 802 (1957). See generally State v. J. C. Penney Co., 48 Wis.2d 125, 179 N.W.2d 641 (1970) ; Note "Usury-Limiting the Time Price Differential Sale Exception," 39 Mo.L. Rev. 111 (1974).

The Alaska usury statute, however, contains much broader language than most usury statutes whose provisions are limited to the regulation of interest rates involving the loan or forbearance of money only. AS 45.45.020 provides:

No person may, directly or indirectly, receive in money, goods, or things in action, or in any other manner, a greater sum or value for the loan or use of money, *or upon contract founded upon a bargain, sale, or loan of wares, merchandise, goods, chattels*, lands, and tenements, than is prescribed in §§ 10–70 of this chapter (emphasis added).

Alaska's statute thus expressly applies to vendor credit transactions such as conditional sale contracts. In State ex rel. Turner v. Younker Brothers, Inc.,[3] the Iowa Supreme Court held that contracts for the sale of propery fell within the purview of their usury statute which is virtually identical to AS 45.45.020.[4] In its opinion, the Iowa court noted that Alaska and the Virgin Islands were the only other jurisdictions which had statutes containing equally expansive language.[5] In view of the broad coverage of the Alaska statute, I agree with the majority in holding that the trial judge's reliance on the time-price doctrine as a basis for holding the transaction not to be usurious was misplaced. Under Alaska's usury statute, we have no discretion to establish a distinction between loans and conditional sale contracts as a matter of policy. That determination has already been made by the legislature. However, the courts must still attempt to distinguish those leases which are actually either loans or conditional sale contracts from those which are true leases. Since the trial court assumed that the time-price doctrine

applied as an exception to the usury law, no analysis was made as to the appropriate criteria for such a distinction.

The problem of distinguishing a true lease from a secured loan most often arises under the Uniform Commerical Code in the context of defining art. 9 "security interests" and resolving competing third party claims. The cases in that area best set forth the relevant tests.

AS 45.05.020(37) presents the Uniform Commercial Code's definition of a "security interest". Concerning leasing arrangements, it provides the following guidelines:

. . . [W]hether a lease is intended as security is to be determined by the facts of each case; however, (A) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (B) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security; [UCC § 1–201(37)]

The Supreme Court of Oregon in Peco, Inc. v. Hartbauer Tool & Die Co.[6] dealt with this portion of UCC § 1–201(37), and it decided that the language interacted in the following manner:

At first glance the provisions of the above section may be somewhat confusing, probably because they are stated in the inverse order of importance. However, upon a careful reading of the entire section it is clear that the first question to be answered is that posed by clause (b)—*whether the lessee may obtain the property for no additional consideration or for a nominal considera*-

3. 210 N.W.2d 550, 553 (Iowa 1973).

4. Iowa Code Ann. § 535.4 (1946) provides: No person shall, directly or indirectly, receive in money or in any other thing, or in any manner, any greater sum or value for the loan of money, or upon contract founded upon any sale or loan of real or personal property, than is in this chapter prescribed.

5. 210 N.W.2d at 559. For a general discussion of the implications of the *Younker Bros.* opinion *see also* "Usury: Consumer credit: Revolving charge accounts fall under the Iowa Usury Laws," 7 Creighton L.Rev. 419 (1974).

6. 262 Or. 573, 500 P.2d 708, 709–10 (1972).

*tion. If so, the lease is intended for security.* If not, it is then necessary to determine "by the facts of each case" whether the lease is intended as security and, in making that determination, the fact that the lease contains an option to purchase "does not [of itself] make the lease one intended for security" (emphasis added).

Thus, the initial inquiry is whether the McGalliards could obtain the property for no additional consideration or for a nominal consideration. In applying this test to the instant case, it appears first that the leasing contract did not provide an option to purchase. At most, the contract allowed the lessee, after the original three year term, to renew the lease annually and presumably indefinitely at a yearly rental amounting to 10 percent of the original purchase price. While the presence of an option to purchase is not in itself proof of a secured transaction, its absence may lend significant support to the argument that a transaction is a true lease. Second, the evidence does not clearly indicate that there was an agreement that the lessee would have an opportunity to become the owner of the property for no additional consideration or for a nominal sum. The majority opinion relies on the case of McKeeman v. Commercial Credit Equipment Corp.[7] In that case, the lessee was told that at the end of the lease term, he could purchase the equipment which had an original price of $42,819.66 by paying one dollar. There was no question but that the consideration was nominal.

I believe that there are several factual issues to be resolved by the trial court in this case. Sparks, the sole owner of Liberty Leasing, testified that he had on occasion reclaimed the equipment he had leased at the end of the three year term if he felt that the fixtures had any additional resale value. Sparks himself never actually reclaimed and resold such lease equipment, but he relied on an implicit buy-back arrangement with the original supplier who would purchase the used equipment at a cost of 10 percent of the original cash price. Sparks admitted that it was his practice to abandon the leased goods to the lessees upon their payment of the residual. That is, he would abandon the property to them if they renewed the lease for one additional year at 10 percent of the original purchase price. Robert Ryland, the salesman for Western Fixtures (the supplier in this case) and later an employee of Liberty Leasing,[8] testified that the salvage value of such repossessed equipment was between 5 and 10 percent of the initial invoice costs. This combined testimony could be found to establish that Liberty Leasing was interested in obtaining the 10 percent residual either from the supplier or from the lessee if at all possible, and that the charge roughly approximated the fair market value of the leased fixtures. Thus, it may be argued that Liberty Leasing treated the goods as any lessor would upon the expiration of a lease. It disposed of them in the manner that would bring it the greatest profit. This would ordinarily be reckoned an incident of ownership. The question whether 10 percent of the original cost can be considered nominal consideration was not considered by the trial court. The trial judge in his oral opinion stated that the testimony concerning the abandonment issue was "relatively confusing", and he made no express finding relating to it. However, in characterizing the agreement as a conditional sale of goods, he did state that the lessee had an implied option to purchase for " . . . a certain little balloon payment"—an indication that he may have thought the consideration to be nominal.

Assuming that this case can be treated as one involving an implied purchase option exercisable at the end of three years, I believe that it is necessary for the trial court to determine whether that sum can be characterized as nominal. Most courts

---

7. 320 F.Supp. 938 (D.Neb.1970).

8. Ryland testified that he was an employee of Liberty Leasing from 1970 to 1972.

agree that nominal consideration may be more than just a few dollars and, therefore, it is a relative term.[9] However, several alternative tests are advocated for defining what constitutes nominal consideration in the context of closed-end leases.

In Peco, Inc. v. Hartbauer Tool & Die Co.,[10] the Supreme Court of Oregon summarized the three major alternative tests:

The more frequently used test is a comparison of the option price with the value of the property at the time for exercising the option. In re Washington Processing, 3 U.C.C.Rep. 475, Bank. No. 202,891–WB (S.D.Calif., June 3, 1966); In re Universal Medical Services, Inc., 8 U.C.C.Rep. 614, Bank No. 70–456 (E.D. Pa., December 4, 1970); In re Alpha Creamery Co., supra; In re Oak Manufacturing, Inc., supra. See, also, In re Crown Cartridge Corp., 220 F.Supp. 914 (S.D.N.Y.1962) (deciding same question under prior statute) [2] The courts also hold that the consideration is nominal if the option price leaves the lessee no "sensible alternative" to the exercise of the option or if completing the purchase is the "only sensible course". In re Washington Processing, supra; In re Alpha Creamery Co., supra; In re Vaillancourt, supra. [3] In some cases there has also been a comparison of the option price with the original list price or with the total rentals required under the lease.[11]

The majority opinion's discussion of the relevant tests is too abbreviated. It relegates to a footnote (Footnote 13) the most frequently used test—the comparison of the option price to the value of the property at the time for exercising the option. In finding that the option price was nominal because the McGalliards were left with no sensible alternative, reliance is placed on the assertion that the value of the fix-

tures to the McGalliards would have been significantly greater than disassembled salvage value. But the trial judge made no finding as to that issue, which on the basis of the evidence submitted, presented a question of fact to be resolved by him. The majority further compares the option price with the original purchase price and utilizes a 10 percent ratio as a basis for concluding such a price to be nominal although, based on the authorities cited, such percentage would appear to present a border line case.

As noted in the above passage quoted from the decision in Peco, Inc., the majority of the courts that have considered the question prefer comparing the option price to the fair market value of the goods at the time the option is to be exercised. If the price approximates the fair market value of the property at that time, the consideration will not be deemed nominal. The Oregon court in Peco, Inc. also adopted this standard. The court felt that "[s]uch a comparison shows whether the lessee is paying actual value or acquiring the property at a substantially lower price".[12]

The federal district court in In re Universal Medical Services, Inc.[13] also found it necessary to compare the option price with the actual market value of the leased items at the end of the term in order to test the nominality of the consideration. There the option price payable at the end of five years was for 10 percent of the original cash price of certain laboratory equipment. The court stated:

The courts, in referring to the term "nominal", frequently use it interchangeably with the sum of one dollar or some other piddling amount . . . but the real yardstick in determining whether the option price is nominal or substantial would appear to hinge on whether that

9. Peco, Inc. v. Hartbauer Tool & Die Co., 262 Or. 573, 500 P.2d 708 (1972); In re Universal Medical Services, Inc., 8 U.C.C. Rep.Serv. 614 (E.D.Pa.1970).

10. 262 Or. 573, 500 P.2d 708 (1972).

11. Id. at 710.

12. Id.

13. 8 U.C.C.Rep.Serv. 614 (E.D.Pa.1970).

price bears a resemblance to the fair market price of the article. . . .

. . . . . .

Hence, I found believable the statements of these witnesses that the fair market value of this equipment would approximate the 10 percent purchase option price, available to the bankrupt at the expiration of five years. This, to me, is no "nominal price". It bears the required "resemblance" to the fair market price required by the decisions. . . .[14]

Thus, the court held that no security interest was created and that the contract was a bona fide lease.

This first test which turns on the fair market value of the item at the time of the outright purchase by the lessee is the simplest for courts to apply. It merely involves comparison of two factors which are easily quantified. It also is based on an apparently logical and just rationale. These attributes more than anything else help explain its widespread popularity. However, as it is applied by most courts, it is essentially a retrospective determination. Thus, it does not give much guidance to parties wishing to enter into a true lease in a situation where the resale market for the leased items is either unknown or apt to fluctuate widely. The parties themselves would not be able to determine the nature of their relationship. Rather, whether they had indeed *leased* the items would turn on the market price of the goods at the end of the term or a court's estimate of that figure in the event of interim default. This difficulty may best be resolved by comparing the option price to the estimated resale value of the property as of the time the transaction was entered into instead of comparing it to the actual market value when the option is exercised.

The second test advocated by some courts is the economic compulsion test. This test states that, whether or not a purchase option price is technically nominal under the previous test, it can be regarded as such given the economic realities of the transaction. The lessee is left with little or no choice. He is compelled to purchase the leased equipment usually because of the equity he has acquired in the property during the lease term which is invariably shorter than the useful life of the equipment.[15] One example of such an arrangement was presented in *In Re Oaks Manufacturing, Inc.*[16] That case involved the lease of a calculator (with a purchase price of $1,195.00) which required 12 monthly rental payments of $109.94 and which contained an option to purchase for 10 percent of the purchase price or $119.-50. The lessee defaulted on his payments and subsequently went into bankruptcy. At the time of the bankruptcy proceeding, the option price was about 13 percent of the then market value of the calculator. The court, in concluding that the arrangement did not constitute a true lease, observed: "The debtor was, of course, not bound to exercise the purchase option, but plainly the amount was so proportionately low, that purchase was the only sensible course open to it."

These cases further illustrate the fact that the first two tests are compatible *alternative* tests. The adoption of the first standard does not necessarily preclude the use of the economic compulsion test under the appropriate circumstances. They are merely alternate methods of defining nominal consideration. The latter standard is

---

14. 8 U.C.C.Rep.Serv. at 617–18 (citations omitted).

15. Not every leasing agreement which provides for an application of part of the rental payments to the purchase price will be considered a security interest lease. *See generally* Xerox Corp. v. Smith, 67 Misc.2d 752, 325 N.Y.S.2d 682 (N.Y.Civ.Ct.1971), which held that, where the sum to be paid upon the exercise of the option to purchase ranged from one-half to almost all of the purchase price, the transaction is a true lease and not a security interest.

16. 6 U.C.C.Rep.Serv. 1273, 1277 (S.D.N.Y. 1969).

the more sophisticated of the two, and it has the added advantage of being a front-end test. Whether a lessee will be economically compelled to exercise his purchase option is a factor that usually will be apparent at the outset of most such agreements. It also encourages the court to view the arrangement as a whole rather than focusing on some narrow ratio of values. Although its usefulness is not limited solely to situations where a lease calls for the building up of an equity at a predetermined rate,[17] this test, however, is not universally applicable.

The results of applying the economic compulsion test to the facts in *McGalliard* are at best ambivalent. On the one hand, the terms of the lease make no provision for the formal application of a part of the rentals towards the purchase price. Thus, during the three year term, the lessee has no equity in the store fixtures he is leasing. In fact, Paragraph 12 of the lease (Insurance)[18] expressly provides that in the event of loss, the lessor will have sole control over the disposition of the proceeds, and that the lessee shall have no pro-rata interest therein even though the lessee is obligated to pay for the insurance during the course of the lease. This defi-

nitely is a factor in favor of construing the arrangement as a true lease.

On the other hand one is left with the impression that, although the disassembled fixtures may be worth only 10 percent of their purchase price on resale, their value to the store owner operating a continuing business may be significantly greater. Therefore, the McGalliards might have felt economically compelled to pay Liberty Leasing its 10 percent residual. Again this is a factual question to be resolved by the trial court. It is not a proper subject for speculation by this court.

The third test mentioned in the *Peco, Inc.* decision refers to a comparison of the option price with either the original list price or with the total rentals required by the lease. Unlike the majority, I find this to be the least satisfactory of the alternative tests in that it ignores the economic realities of variable depreciation rates, resale market variables, etc. The mechanical application of this type of judicially-determined percentage formula is too simplistic an approach.[19]

As indicated previously, these tests pertain to the Uniform Commercial Code and are pertinent in distinguishing a true lease

---

17. *See* In Re Oak Manufacturing, Inc., 6 U.C.C.Rep.Serv. 1273 (S.D.N.Y.1969).

18. 12. INSURANCE. LESSEE shall at its own expense keep the EQUIPMENT insured against such risks and to such amounts and with such companies as LESSOR shall determine. Said insurance shall provide for loss, if any, payable to the LESSOR for the value of its interest in the EQUIPMENT only. LESSEE shall have no Pro Rata interest in any such policies or the proceeds thereof. Subject to the provisions of paragraph 20 with regard to risk of loss, and without limiting such provisions in the case of any loss or damage covered by insurance, and only to the extent that such loss or damage is covered by such insurance, the proceeds of such insurance shall be applied, at the option of LESSOR, (a) toward the replacement, restoration or repair of EQUIPMENT which may be lost, stolen, destroyed or damaged or (b) toward the obligations of LESSEE for rent hereunder. In the event the LESSOR elects to apply insurance proceeds to the repair or to the replacement of the damaged

EQUIPMENT, this LEASE shall continue in full force and effect. In the event the LESSOR elects to apply insurance proceeds to the payment of LESSEE'S obligations for rent hereunder, the LESSEE'S obligations for all or part of the rent shall cease only with respect to the items damaged, lost, stolen or destroyed, the abatement of rents in such event being the amount of the insurance settlement received which is allocated to the item or items lost, stolen, damaged or destroyed, and the monthly rentals for the remainder of the term shall be reduced prorata.

19. For instance, if the rule were adopted that every time the option price was more than 10 percent of the list price, an agreement would be construed to be a lease, this would ignore any distinction based on the absolute amounts involved ($100 or $100,000). This point is illustrated in In re Oak Manufacturing, 6 U.C.C.Rep.Serv. 1273 (S.D.N.Y.1969), where even though the option price was 10 percent of the list, it still amounted to less than $120 which, under the circumstances, the lessee would feel compelled to pay.

from a secured transaction or a conditional sale. One must next ask whether they can or should help us distinguish a lease from a usurious loan; whether one consistent definition of a *lease* should apply across the board in all situations. Most of the cases cited deal with art. 9 of the U.C.C. which is essentially a legislative attempt to bring a measure of certainty to the body of law relating to secured transactions. This portion of the Uniform Commercial Code [20] mandates a filing system and prescribes an elaborate scheme for determining the priority of conflicting third party security interests in a variety of different commercial and consumer situations. The primary purpose of the filing requirement is to give *notice* to subsequent creditors of the existence of prior security interests in certain of the debtor's collateral. Thus, especially in the commercial setting, the goal of the legislation is the protection of innocent third party creditors from the possibility that hidden liens attaching to the debtor's property will leave them without any valuable rights in the bargained-for security.

Given this rationale, one can more easily perceive the dilemma presented by leasing agreements. Even a classic lease of personal property presents the danger of operating as a hidden lien to some unsuspecting creditor who may have advanced the debtor credit thinking the leased asset was available as collateral for the loan. This fact, in turn, puts pressure on the court to interpret the term "security interest" expansively, and the term "lease" more restrictively.

The same policy considerations do not apply to usury laws. One obvious difference is that one is dealing with a relationship between only two parties—the lender (seller, lessor, etc.) and the borrower.[21]

Furthermore, under the facts of the instant case, one is dealing not with a necessitous consumer borrower which might justify a more expansive application of the usury laws, but with a commercial transaction between a leasing company and a couple experienced in operating a small business.[22]

The policy arguments forwarded by the appellee Liberty Leasing concerning the detrimental effects of making such leases subject to the usury laws would have on the credit market in a state suffering from chronic scarcity of investment capital also merit attention. The court's holding in the present opinion could have two possible adverse consequences: (1) it could restrict the availability of capital to new entrants and higher risk businesses by failing to allow good faith lessors to impose a reasonable charge commensurate with the added risks, and (2) more sophisticated lessors may eventually start marking up the base cost of the leased item and thus bury the actual cost of financing the transaction.

In the absence of any persuasive reasons for liberally construing and applying the usury laws, most courts have tended to interpret the statute as narrowly as possible. This is demonstrated by the widespread acceptance of the time price doctrine. No other pressing social interest would be served by broadly applying the usury prohibition to *commercial* leases such as that presented in *McGalliard*.

In view of these various considerations, I believe that the courts should narrowly construe the usury statute in reaching a determination as to whether or not a lease is subject to its terms. The resolution of factual disputes as well as the initial decision on these questions is, of course, for the trial court. Since in this case the judge did not have the opportunity to con-

---

20. Article 9, "Secured Transactions", AS 45.05.690–794.

21. Other parties may be involved in the initial transaction as suppliers or sellers, but the usury statute only applies to that agreement between the borrower and the party who eventually extends the credit.

22. Admittedly, the relative degree of sophistication of the parties was an issue relating to the defendants' claim of misrepresentation. However, the trial judge expressly found that there were no fraudulent, negligent or innocent misrepresentations made by the plaintiff.

sider the appropriate tests and policy considerations in determining whether the lease was to be regarded as a loan, I would remand for his determination in accordance with these criteria.